# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,

v.

ARTURO JUAREZ SUAREZ,
Defendant and Appellant.

S105876

Napa County Superior Court
CR103779

August 13, 2020

Justice Liu authored the opinion of the Court, in which Chief Justice Cantil-Sakauye and Justices Chin, Corrigan, Cuéllar, Kruger, and Groban concurred.

Justice Liu filed a concurring opinion, in which Justice Cuéllar concurred.

PEOPLE v. SUAREZ

S105876


Opinion of the Court by Liu, J.


After this case was transferred from Placer County to Napa County, a jury found defendant Arturo Juarez Suarez guilty of the first degree murders of José Martinez, Juan Martinez, J.M., and A.M. (Pen. Code, § 187, subd. (a)) and found true the allegations that he personally used a firearm in the murders of José and Juan (*id.* § 12022.53, subd. (d)) and that he personally used a deadly and dangerous weapon in the murders of J.M. and A.M. (*id.* § 12022, subd. (b)(1)). (All undesignated statutory references are to the Penal Code.) The jury found true the special circumstances that he committed these murders while lying in wait (§ 190.2, former subd. (a)(15)) and that he had been convicted of more than one offense of murder in the first or second degree (§ 190.2, subd. (a)(3)). The jury also found him guilty of forcible rape (§ 261, subd. (a)(2)), unlawful penetration by a foreign object (§ 289, subd. (a)), and kidnapping to commit rape (§ 209, subd. (b)(1)) of Y.M., and the jury found true the enhancement allegations for those offenses. Following the penalty phase, the jury returned a verdict of death. The trial court sentenced him to death. This appeal is automatic. (§ 1239, subd. (b).) We affirm the judgment.

## I. FACTS

### A. Guilt Phase

#### 1. Prosecution Case

##### a. Before the murders

Arturo Juarez Suarez (Juarez) was a seasonal worker at the Parnell Ranch in Auburn in 1998. He lived in a trailer on the ranch and worked six days a week, typically taking Sundays off. He was married to Maria Isabel Juarez de Martinez (Isabel), and he was friends with her brothers José and Juan Martinez, all of whom had grown up in the same town in Mexico.

José and his wife Y.M. lived in Galt with their five-year-old son, J.M., and three-year-old daughter, A.M. Juan also lived with them. Juarez often spent holidays and weekends with the family. He had a good relationship with J.M. and A.M.

Y.M. testified that Juarez made her uncomfortable on two occasions, a few years before the capital crimes. One time, he grabbed her waist, she told him to let her go, he said he was not going to do anything, and he let her go. She slapped his face, and he told her not to hit him. Another time, he touched her ribs and her neck, and she told him to leave her alone. She told José about one of these occasions, and it caused some problems that were ultimately resolved.

On July 4, 1998, José, Y.M., J.M., A.M., and Juan visited San Francisco without telling Juarez. When they returned, Juarez and his friend Ernesto Orozco were at the Martinezes' home. Juarez and Orozco spent the night there. Y.M. thought Juarez seemed upset when they said that they had not been able to call him before they had left for San Francisco that day. Orozco testified that he did not notice any problems, but on the drive there, he commented that the Parnell Ranch seemed like

a nice place to live, and Juarez replied, "You're way off. One can go crazy here by oneself."

Before leaving, Juarez made plans with José for the next weekend. Y.M. testified that her family planned to pick him up from the Parnell Ranch on Sunday, July 12 and give him their car to attend an immigration appointment on Monday, July 13. Juarez told his boss, Jack Parnell, that he planned to work on July 12 and take off July 13.

### b. *July 12, 1998*

At 4:00 or 4:30 p.m. on July 12, José, Y.M., J.M., A.M., and Juan arrived at the Parnell Ranch. José wore a watch, Juan wore gold chains, and both carried wallets. Y.M. wore green shorts, a white shirt, and tennis shoes.

When they arrived, they did not see Juarez. Y.M. went to his trailer to retrieve some soap to wash their car. As she returned to the car, she saw Juarez and José walking together toward it. She did not see Juan. Before washing the car, José needed to fix an issue with the car's battery, and Juarez gave him a knife to assist. While José fixed the issue, Juarez left. When Juarez returned, he asked José to accompany him, which José did. Y.M. finished washing the car, went toward the trailer, and saw Juarez and José standing in the field.

Juarez returned and asked Y.M. for the car keys, which she gave him. He went into his trailer, changed his pants, and asked her if she wanted anything from the store. She requested chips and a tea drink. Around this time, she noticed a rifle "standing there," although she did not recall its precise location. Once he left, she walked around the ranch with her children for an hour and a half.

Juarez returned with chips, a tea drink, and beer. Y.M. asked where José and Juan were, and Juarez said that they were cleaning and cutting a deer that he had killed. Juarez asked her to cut some aluminum foil for the deer meat and said that he was going back to the deer. After cutting some foil, Y.M. sat in a chair outside the trailer. J.M. and A.M. played Nintendo, which Juarez had turned on for them, inside the trailer, and later came outside.

Suddenly, Juarez put a rope around Y.M.'s neck, dragged her to the trailer, and kicked her. Her children cried; J.M. yelled, "Don't hit my mommy," and A.M. hugged J.M. Juarez shouted at J.M. to shut up. Y.M. lost consciousness.

Inside the trailer, Juarez put a chain around Y.M.'s neck, tied her wrists behind her back, and tied her feet. When she regained consciousness, Y.M. was lying on the floor on her back. He cut her shorts and underwear with scissors, exposing her private parts, and he unzipped his pants. He put his fingers in her anus and his penis in her vagina. He said, "Since you didn't want to willingly, now you're gonna get fucked up." She screamed for her husband. She did not hear her children at this time.

Juarez tied Y.M. to something before leaving and coming back. She lapsed in and out of consciousness. He told her not to move too much or else she would get strangled. He put a handkerchief around her mouth, using gray tape; turned on the radio loud; and left. She lost consciousness. Eventually, she untied herself and left, leaving behind a tennis shoe and taking a knife to defend herself. She did not turn off the radio. She ran to Dorothy Parnell's home, located on the ranch. Dorothy let her inside and called 911 at 9:15 p.m.

Jack and his son Jacob Parnell testified about that day. In the late morning or the afternoon, Jack told Juarez to clean an area near a barn on the ranch, and Juarez seemed abrupt, which was out of character. Around 5:00 p.m., Jack saw Juarez driving the Martinezes' car much faster than usual. Around 6:30 or 7:00 p.m., Jacob saw Y.M. and her children walking around the ranch. Between 7:15 and 7:30 p.m., Jacob saw Juarez driving a tractor with a trailer. Also, sometime in the days or weeks before that day, Jack saw Juarez coming from a target range area on the ranch and carrying a small caliber rifle, which he had not seen him carry before.

### c. The investigation

When law enforcement officers arrived at the Parnell Ranch, Y.M. was hysterical. She wore a long shirt that had blood on it, a bandanna around her neck, and beige underwear that Dorothy had given her. She had a sock and a tennis shoe on her left foot, and a sock and a cord tied around her ankle on her right foot. She had blue-green underwear, with its crotch area cut, wrapped around her waist. She had rope marks around her ankles, wrists, and throat, and duct tape in her hair and wrapped around her neck. Her face and lip were swollen, and she had dried blood in her mouth, blood coming out of her right ear, and abrasions, bruises, and discoloration around her eyes. That night, she repeated "Arturo bad" and described his attack.

Around 9:30 p.m., Deputy Mark Reed and Deputy Kurt Walker entered Juarez's trailer to look for him. He was not there. Deputy Reed located and seized a .22-caliber rifle and a .30-06 rifle. The .22-caliber rifle was loaded, and there was ammunition for the .30-06 rifle in the trailer. Around 11:45

p.m., Detective William Summers and Deputy Randy Owens entered Juarez's trailer in an effort to locate identifying information.

The following day, Y.M. returned to the Parnell Ranch and noticed, in front of the trailer, a piece of broken wood that had not been there the day before. That afternoon, Detective Desiree Carrington searched the trailer pursuant to a warrant. Outside the trailer, she saw a wooden stick, twine, a chair, an iced tea can, a beer can, a golf club, clear glass, duct tape, rope, a silver chain, a pair of green shorts with a brown belt, and three .22-caliber expended casings. In the screened porch, she found duct tape, a silver chain, a roll of plastic wrap inside an aluminum foil box, aluminum foil, and a pair of scissors. Inside the trailer, she saw twine, a black wallet or checkbook cover, a white tennis shoe, a roll of duct tape, boxes of ammunition, and a 12-pack of beer, among other items. There were boots under the bed, and inside them were three metal chains, a watch, and two wallets containing identification for José and Juan, $147 in American currency, and $80 in Mexican pesos. These items did not have dirt on them, and the clasps on the chains appeared undamaged.

A piece of duct tape containing strands of dark hair was found in the field. A criminalist testified that the hair could have come from A.M.'s head. From the location of the tape, deputies noticed a set of faint tire tracks leading toward some berry bushes. Following them with the assistance of search dogs, they came across a manmade opening in the bushes, with some sticks and wood placed in front of it. This opening was approximately a quarter-mile from the trailer. There, they found an area of freshly moved dirt that appeared to be a grave. There were no apparent blood trails or smears leading up to it.

Near it, there was a blood-spattered, square-nosed shovel without a handle and a round-nosed shovel.

The grave was rectangular, measuring approximately five and a half to six feet in length, two feet in width, and three feet in depth. Its walls were cut smoothly, at 90-degree angles. An excavation team unearthed a child's leg at approximately 19 inches deep. They then unearthed, first, a male child lying facedown; second, a female child lying faceup with a stick in her hand and her mouth open and covered with dirt; third, an adult male lying faceup with his legs and his right arm outstretched and his left arm crossed over his chest; and, finally, an adult male lying faceup with his legs outstretched and his hands crossed over his chest. There was a .22-caliber expended casing inside the grave and an apparent blood stain on the floor of the grave.

### d. The autopsies and Y.M.'s injuries

Dr. Donald Henrikson performed the autopsies. J.M. had a depressed skull fracture and linear fractures extending into the base of his skull; contusions and abrasions on his face, back, and wrist; and hematomas in his shoulders, chest, and soft tissue near his skull. He had residue of adhesive tape around his mouth, cheek, arms, and legs. His mouth, trachea, and bronchial tree were full of dirt, and dirt was mixed with moisture near his mouth and nose. He was hit at least once on his back and eight times on his head. His back injury was consistent with a tubular instrument, such as a shovel handle, and his head injury was consistent with a shovel head. The blunt force trauma likely rendered him unconscious but was not sufficient to cause his death. He died of asphyxiation by

obstruction of the airway due to aspiration of foreign material (soil).

A.M. had three fractures in her skull, hematoma over both sides of her head, and contusions and abrasions on her face, head, trunk, arms, and legs. She held a twig, and her airways had mud in them. She had residue of adhesive tape on her chin, arms, and left ankle. The blunt force trauma likely rendered her unconscious but was not sufficient to cause her death. She died of asphyxiation due to obstruction of her airway by aspiration of foreign material (soil).

José died of two gunshot wounds to his head, one to the back of his head and one in front of his left ear. Both were contact wounds, fired from less than an inch away. He also had abrasions and contusions on his head, trunk, arms, and right leg, and abrasions and contusions on his back, which suggested that he might have been dragged while supine.

Juan died of three gunshot wounds to his head, all of which were fired from less than an inch away: one to his upper right forehead; one to the left side of his nose; and one to the back of his head on the right. He also had abrasions and contusions on his trunk and arms.

Kim Marjama, a sexual assault nurse examiner, conducted a sexual assault examination of Y.M. Y.M. had swelling, contusions, abrasions, and lacerations on her face, blood in her right inner ear canal, and a hematoma in her right eye. There were swelling, contusions, and abrasions on her neck, and a red linear abrasion encircling her neck. She had contusions and abrasions on her arms and legs, and red linear abrasions encircling her wrists and ankles. In addition, she had marked edema bilaterally to her labia and a divot in her right

inner labia.  She had marked edema and contusions in the periurethral area, and erythematous edema and an abrasion to the posterior fourchette.  She had normal findings inside her vagina, and no sperm was found.  Marjama testified that the posterior fourchette injuries were consistent with blunt force trauma, which was consistent with penile penetration, and that the divot in the labia was indicative of digital penetration.

### e. *Juarez's flight and arrest*

On Monday, July 13, Juarez went into a drugstore in Auburn, purchased a shirt and a cowboy hat, and asked for quarters.  He used a pay phone outside the store.  He called, among others, his cousin Pablo Juarez and asked Pablo to pick him up at a bus station in Sacramento.  Pablo did so.  Juarez told Pablo that he had been in a fight.  He said he had killed José, Juan, and the children, beaten Y.M., and shot José and Juan and put them in a hole.  He told Pablo the children had wanted to see their father and uncle, but he did not say how he had killed the children.  He left Pablo's home that night.

On Tuesday, July 14, Juarez arrived at Josefina Torres Yanez's apartment in Wilmington, where she lived with Jorge Lucho and their children.  Juarez told Torres that he had shot and killed his brothers-in-law in self-defense because they were going to kill him.  He told her that he had killed the two children by hitting them with a stick or a shovel.  He did not know why he had killed the children, but he said they had been crying and he had been nervous.  He told her that he had hit and dragged Y.M. by her neck but had not raped her.  Juarez told Lucho that he had gotten into an argument with two coworkers, and while defending himself, he had shot and killed them.  Torres also

testified that approximately a week earlier, Juarez had told her that his in-laws would kill him and he wanted to commit suicide.

On Wednesday, July 15, law enforcement officers arrested Juarez at the apartment. From the apartment, they seized a cowboy hat and a bag containing some clothing, a pocket knife, and a pen. Following his arrest, Long Beach Police Detective Dennis Robbins and FBI Special Agent Elizabeth Stevens transported him to the police station. During the drive, Juarez asked Stevens, who spoke Spanish, why they had arrested him (or something to that effect), and she told him he was being arrested for four murders and the rape of a female. He said he did not rape the female. He also said he had planned to leave the following day for Mexico.

At the station, he said the murders were true but he did not rape the woman. Detective Robbins and Agent Stevens interrogated Juarez for approximately an hour. Juarez said he got into a heated discussion with his brothers-in-law after they had accused Juarez of womanizing, which he denied. He was carrying a rifle, which Juan requested and placed on the ground. Juarez then shot the men with the rifle and dragged their bodies to a hole. He returned to the trailer and beat his brother-in-law's wife. He did not know why he beat her but said he had experienced sleeplessness and nervousness. He then walked the children to the hole. He did not know what he intended to do with them. During the walk, the girl became tired, so he let go of the boy's hand and carried her. Once there, he hit the boy with the wooden part of a shovel, then hit the girl too, put their bodies in the hole, and put dirt on them. He walked back to the trailer, saw police cars, and ran up a hill.

After being transported to Placer County, Juarez was interrogated the next morning by Sergeant Bob McDonald and Detective Michael Bennett. Interpreter Frank Valdes translated their questions into Spanish for Juarez. A tape of the interrogation was played.

In the interrogation, Juarez initially said he shot José and Juan during an argument. He said that he then beat and tied Y.M. and touched her vagina. The children cried, and he taped them to quiet them; he removed the tape when he went outside the trailer, leaving Y.M. tied up. He then walked with the children because they wanted to see their father. The children calmed down. He walked them to the hole, hit them over the head with a stick, put them with José and Juan, and put some dirt over them.

Later in the interrogation, he said that he had planned it all for about a week. Although he initially said he dug the hole that day, he subsequently said he dug the hole on Monday or Tuesday. He dug the hole deep enough to fit Y.M. Asked if he planned this because he had problems with the family, he replied affirmatively. He said he killed José and Juan near the hole, after telling them that he had shot a deer and needed them to go to it. He took their wallets and jewelry to avoid their being identified. He said he killed the children because he did not have any other way out. He also said that for five or six years he had suffered from sleeplessness and nervousness that affected his actions.

### f. Other evidence

Criminalists testified that the casing found inside the grave and the three casings found around the trailer had been fired from Juarez's .22-caliber rifle. Bullet fragments recovered

11

from José and Juan could have been fired from the rifle, but there were insufficient points of comparison to conclude that they were. Scrapings from J.M. and A.M. revealed adhesive residue. DNA analysis was conducted of several items, including the shovel, Juarez's black pants, Y.M.'s blue underwear, and the scissors. Juan could not be eliminated as a contributor of the DNA on the shovel. Juarez and Y.M. could not be eliminated as contributors of the DNA on his black pants and on her blue underwear. Juarez could not be eliminated as a contributor of the DNA on the scissors, and a random match of this profile would be expected in approximately one in 21,000 Hispanics. Juarez's fingerprint also was found on duct tape. Finally, the jury visited the Parnell Ranch.

### 2. *Defense Case*

The defense cross-examined some witnesses about Juarez's demeanor after July 12 and his complaints of headaches, sleeplessness, and nervousness. The defense also presented four witnesses. Y.M. testified that Juan sometimes did not accompany the family to the Parnell Ranch, so she did not know if Juarez thought Juan would accompany them on July 12. Detective Diana Stewart testified that on July 13, Y.M. had said she was not sure whether she had seen Juarez's penis because she had lapsed in and out of consciousness. A pathologist testified that Y.M.'s injuries could have been caused by hands or fingers, and it was inconclusive whether penetration had occurred. An interpreter testified about translation and transcription errors in the taped interrogation.

## B. Penalty Phase

### 1. *Prosecution Case*

Y.M. testified about the deceased victims. Juan, who was 27 years old, participated in activities with Y.M.'s family. José, who was 37 years old, enjoyed helping people, playing soccer, and playing with his children. He planned to own a business and a home. J.M. and A.M. were affectionate and protected one another. J.M. enjoyed going to school and being outside, and A.M. enjoyed playing with toys, going to McDonald's, and going to the park.

When Y.M. learned about their deaths, it was "like a nightmare," and she "felt that [her] life had no meaning." She felt alone and hopeless. She had to learn how to drive and to find work to support herself. She wished she could turn back time and give her life for her children, and she felt a lot of pain for having been unable to do anything for them as they watched her being beaten. She missed everything about her family. She did not have plans for the future; she said that it was very difficult but that she will move on "with the help of God."

During her testimony, the prosecutor introduced a photograph of the family, a photograph of Juan with J.M. and A.M., and a home video of J.M. and A.M. on the day of their murders.

### 2. *Defense Case*

Juarez's mother, Maria Suarez Aguilar, had 10 children with her husband, Tomas Juarez Gonzalez, in Santa Gertrudis, Mexico. One of the children, Abundio, died in an accident. The family was poor; they slept in the same room and did not have a bathroom inside the house. Sometimes there was no food for the children. Juarez was one of the youngest children. His mother

did not take him to see a doctor or a dentist, even when he had the measles. He began work around the age of 10 and gave her his money. He later sent her money from the United States.

She testified that until about 10 years ago, her husband drank almost every day, and he hit her and said nasty things to her. He yelled at the children but did not hit them. She recalled a time when her son Abundio took her to Mexico City to protect her.

Juarez's living siblings testified about their childhoods and expressed their love for him. Benjamin Juarez Suarez testified that their home did not have electricity or hot water when Juarez was born. Their father drank, hit their mother, and yelled at her and the children. Sometimes they had no food, and their father used their money to purchase alcohol. When their mother left for Mexico City, some of the siblings, including Juarez, stayed with their father. The family suffered when Abundio died. Isaias Juarez Suarez testified that their father drank and hit, kicked, and ripped clothing off their mother. When this happened, Juarez became frightened and sad. Their father also called the children vulgar names and hit Juarez several times. Later, one of Isaias's children died from leukemia, and Juarez provided money for his treatments and funeral. Silviano Juarez Suarez testified that their father drank, but he hit the children only if they did something wrong.

Beatriz Juarez Suarez testified that their father drank and yelled at their mother and the children. During one argument, he threw a glass, which cut her sister Celia Juarez. Celia testified about that argument and about their father drinking and hitting their mother, their mother leaving for Mexico City, and the lack of food at home. She testified that

their father yelled at Juarez and hit him if he did something wrong. Daniel Juarez Suarez testified that their father drank and sometimes hit or squeezed Juarez. Miroslava Juarez Suarez testified that their father hit their mother, used money to buy alcohol instead of food, and hit the children when they did something that he did not like. Maria Juarez Suarez testified about their father drinking and hitting them, their mother leaving for Mexico City, and the lack of food at home. One time, their father threw her onto the bed and tried to rape her, but she freed herself.

In addition, Benjamin's wife testified that she once saw their father go after Abundio with a knife. Daniel's wife testified that Juarez was one of her children's godfathers and that he wrote her a letter when her father died. A neighbor also testified about their father's drinking, and other witnesses testified about Juarez's generosity. Juarez's former teacher testified that he received good grades, was diligent, polite, and extroverted, and finished secondary school. He did not attend preparatory school because he thought it would be better to work and support his family.

Juarez's daughter, Liliana Juarez Martinez, testified that she loved him. Juarez's wife, Isabel, testified that she gave birth to their daughter Liliana in 1990, and they married in a civil ceremony. She gave birth to their second daughter Jessica in 1992. She lived with Juarez in the United States for a few years, but she returned to Mexico in 1995 when she experienced medical problems. He sent her money about every three weeks, and he brought his daughters toys when he visited them.

Isabel testified that in 1998 she asked for a separation because she was jealous, but he did not agree. They ultimately

resolved the issue between them. She also testified that he complained of headaches and sleeplessness, for which he obtained some medicine in 1998. Around this time, in March 1998, Juarez told Daniel that he was having headaches and back pain, and Juarez looked sad and serious. In April 1998, Juarez appeared sad and moody to Beatriz and her husband.

A clinical psychologist and psychosocial and cultural expert testified that Juarez's father brought shame to the family and affected the children's emotional and social development. When Juarez's mother departed for Mexico City, it created a sense of abandonment, and Abundio's death caused significant grief. The expert testified about the effects of poverty on their childhood and about the general experiences of migrant workers.

James Esten, a correctional consultant, testified as an expert that Juarez would be able to adapt to the conditions of life imprisonment without parole, without posing a threat to others. While Juarez was housed in Placer County and Napa County, he received no disciplinary write-ups, and his security classification was reduced.

## II. JURY SELECTION ISSUES

### A. Challenges to Death Qualification

" 'A prospective juror may be challenged for cause based upon his or her views regarding capital punishment only if those views would " 'prevent or substantially impair' " the performance of the juror's duties as defined by the court's instructions and the juror's oath.' " (*People v. Wall* (2017) 3 Cal.5th 1048, 1061–1062.) Juarez contends that this process of excluding prospective jurors whose views would prevent or substantially impair the performance of their duties creates an

unconstitutional death penalty scheme and violates his rights under statutory, constitutional, and international law. He further contends that this process violates the rights of excluded prospective jurors. Except as discussed below, he does not argue that the excluded jurors failed to meet the applicable standard for exclusion; rather, he asks us to reconsider our decisions permitting such exclusion.

Even if we assume that Juarez did not forfeit these claims and has standing to assert them, they lack merit. Juarez argues that our state statutes do not permit the death qualification process and asks us to overturn our contrary conclusion in *People v. Riser* (1956) 47 Cal.2d 566 (*Riser*). In *Riser*, we interpreted Penal Code former section 1074 (now Code Civ. Proc., § 229), which provided in relevant part that " '[a] challenge for implied bias may be taken for all or any of the following causes, and for no other . . . [subdivision] 8. If the offense charged be punishable with death, the entertaining of such conscientious opinions as would preclude his finding the defendant guilty; in which case he must neither be permitted nor compelled to serve as a juror.' " (*Riser*, at p. 573, quoting, Pen. Code, former § 1074, subd. (8).) We held that even though "a literal reading of section 1074, subdivision 8, does not compel the exclusion of jurors incapable of exercising the discretion contemplated by section 190" to decide whether death or life imprisonment is the appropriate punishment, "[i]t would be doing violence to the purpose of these sections of the Penal Code . . . to construe section 1074, subdivision 8, to permit these jurors to serve" and "would in all probability work a de facto abolition of capital punishment, a result which, whether or not desirable of itself . . . is hardly appropriate for this court to

achieve by construction of an ambiguous statute." (*Riser*, at pp. 575–576.)

We have confirmed our holding in *Riser*, *supra*, 47 Cal.2d 566. (See, e.g., *People v. Mabry* (1969) 71 Cal.2d 430, 445; *People v. Gonzales* (1967) 66 Cal.2d 482, 497–499; *People v. Smith* (1966) 63 Cal.2d 779, 789.) In *People v. Hovey* (1980) 28 Cal.3d 1, 9, footnote 9 (*Hovey*), we stated, "Th[e] legislative 'preference for one jury qualified to act throughout the entire case' [citation] would seem to be inconsistent with a literal reading of section 1074, subdivision 8, and thus supports the judicial gloss placed on that section by *Riser* and its progeny." Juarez provides no persuasive reason to overturn our precedent. Nor does he demonstrate that the process lacks statewide uniformity in its application.

In addition, we have considered and rejected claims that the death qualification process is unconstitutional. (See, e.g., *People v. Mendoza* (2016) 62 Cal.4th 856, 912–915 (*Mendoza*); *People v. Chism* (2014) 58 Cal.4th 1266, 1286; *People v. Tully* (2012) 54 Cal.4th 952, 1066 (*Tully*); *People v. Taylor* (2010) 48 Cal.4th 574, 602–604 (*Taylor*).) As we summarized in *Mendoza*: " 'The death qualification process is not rendered unconstitutional by empirical studies concluding that, because it removes jurors who would automatically vote for death or for life, it results in juries biased against the defense. [Citations.] [¶] *Lockhart* [*v. McCree* (1986) 476 U.S. 162] . . . , which approved the death qualification process, remains good law despite some criticism in law review articles. [Citations.] "We may not depart from the high court ruling as to the United States Constitution, and defendant presents no good reason to reconsider our ruling[s] as to the California Constitution." [Citation.] [¶] . . . Nor does the process violate a defendant's

constitutional rights, including the Eighth Amendment right not to be subjected to cruel and unusual punishment, by affording the prosecutor an opportunity to increase the chances of getting a conviction. [Citations.] Defendant claims the voir dire process itself produces a biased jury. We have held otherwise. [Citation.] [¶] Death qualification does not violate the Sixth Amendment by undermining the functions of a jury as a cross-section of the community participating in the administration of justice.'" (*Mendoza*, at p. 914.) We have rejected the arguments that "the death-qualification process fails to produce the heightened reliability required for death judgments" and that the death qualification process violates equal protection "because capital defendants receive different, more conviction-prone juries than other defendants." (*Id.* at p. 913.)

We have found "flawed the premise underlying defendant's assertion that death qualification, by eliminating the segment of the community that opposes the death penalty, skews the data courts typically rely on to determine 'evolving standards of decency' for Eighth Amendment purposes. Through the death qualification process, individuals may be excused not only for their unyielding opposition to capital punishment but also for their intractable support of it. [Citations.] We reject defendant's contention that death qualification is irrational because it disqualifies individuals based on their moral beliefs when the penalty phase determination is ' "inherently moral and normative." ' [Citation.] Disqualified jurors are properly excused for cause, not on the basis of their personal, moral beliefs regarding the death penalty, but because of their inability to 'temporarily set

aside their own beliefs in deference to the rule of law.' " (*Taylor*, *supra*, 48 Cal.4th at pp. 603–604.)

We have rejected the argument that death qualification violates a defendant's right to a jury selected from a representative cross-section of the community. (*Taylor*, *supra*, 48 Cal.4th at p. 603.) We have concluded that " '[t]he impacts of the death qualification process on the race, gender, and religion of the jurors do not affect its constitutionality.' " (*Mendoza*, *supra*, 62 Cal.4th at p. 914; accord, *Tully*, *supra*, 54 Cal.4th at p. 1066.) We have rejected "[the] further assertion that death qualification violates [a defendant's] right to a representative jury because empirical studies show that the process results in a disproportionate number of ethnic minorities, women, and religious individuals being removed from capital juries." (*Taylor*, *supra*, 48 Cal.4th at p. 603.) "As the high court explained in rejecting a defendant's claim of an unrepresentative jury, unlike the impermissible removal of ethnic minorities or women from jury service, ' "[d]eath qualification" . . . is carefully designed to serve the State's concededly legitimate interest in obtaining a single jury that can properly and impartially apply the law to the facts of the case at both the guilt and sentencing phases of a capital trial. There is very little danger . . . that "death qualification" was instituted as a means for the State to arbitrarily skew the composition of capital-case juries.' " (*Ibid.*, quoting *Lockhart v. McCree*, *supra*, 476 U.S. at pp. 175–176.) Although Juarez cites recent studies purporting to show troubling data that "blacks are significantly more likely than whites to be excluded from capital juries through death qualification," these studies do not establish, contrary to our precedent, that the death qualification process is unconstitutional.

We also find unpersuasive the related claim that this process violates the rights of excluded prospective jurors. As the high court has stated, "the removal for cause of '*Witherspoon-*excludables' in capital cases does not prevent them from serving as jurors in other criminal cases, and thus leads to no substantial deprivation of their basic rights of citizenship. They are treated no differently than any juror who expresses the view that he would be unable to follow the law in a particular case." (*Lockhart v. McCree, supra*, 476 U.S. at p. 176; see *Witherspoon v. Illinois* (1968) 391 U.S. 510.) Again, the death qualification process "is carefully designed to serve the State's concededly legitimate interest in obtaining a single jury that can properly and impartially apply the law to the facts of the case at both the guilt and sentencing phases of a capital trial." (*Lockhart*, at pp. 175–176.)

Finally, we have concluded that the death qualification process does not violate international law. (See *People v. Krebs* (2019) 8 Cal.5th 265, 351.) In sum, we reject Juarez's contentions that the death qualification process violates statutory, constitutional, or international law.

## B. Excusal of Prospective Juror Deborah B. for Cause

Juarez contends that the trial court erred in excusing Prospective Juror Deborah B. based on her views about the death penalty.

"Under *Wainwright v. Witt* (1985) 469 U.S. 412, 424 [83 L.Ed.2d 841, 105 S.Ct. 844] (*Witt*), we consider whether the record fairly supports the trial court's determination that [a prospective juror's] views on the death penalty would have prevented or substantially impaired her performance as a

juror." (*People v. Thomas* (2011) 52 Cal.4th 336, 357.) " ' "Generally, a trial court's rulings on motions to exclude for cause are afforded deference on appeal, for 'appellate courts recognize that a trial judge who observes and speaks with a prospective juror and hears that person's responses (noting, among other things, the person's tone of voice, apparent level of confidence, and demeanor), gleans valuable information that simply does not appear on the record.' " ' " (*Id.* at p. 358.) " 'When the prospective juror's answers on voir dire are conflicting or equivocal, the trial court's findings as to the prospective juror's state of mind are binding on appellate courts if supported by substantial evidence.' " (*People v. Wall*, *supra*, 3 Cal.5th at p. 1062.)

In Prospective Juror Deborah B.'s jury questionnaire, she wrote, "If the person is found guilty and the jurors have found them guilty then I believe in the death penalty." She believed the state should automatically put someone to death for intentionally killing a human being, murdering more than one human being, randomly killing a human being for no apparent reason, or killing a child. Asked in what kind of murder case life imprisonment without the possibility of parole might be appropriate, she wrote, "I believe if you went out to murder someone and you killed them — death penalty — if the murder was an accident life without the possibility of parole." She said that she did not have views or beliefs that would make it either impossible or extremely difficult for her to consider or vote for the death penalty, and she would not automatically vote for the death penalty or life imprisonment without the possibility of parole based on the information she knew about this case. She identified herself as belonging to group 4, which was defined as

having some doubts or reservations about the death penalty but not always voting against it.

She expressed some hesitation, however, about her ability to vote for the death penalty. Asked her general feelings about the death penalty, she wrote, "I do not feel this is my job giving someone the death penalty[.] I am not <u>God</u>." She said she did not have strong opinions about the death penalty, but commented, "I just would not like to give someone a death penalty." Asked whether she supported the death penalty, she checked both the yes and the no boxes, explaining, "I believe in the death penalty but would not want to be the juror who had to make the decision." She likewise checked both the yes and the no boxes when asked whether she opposed the death penalty; whether she would refuse to find the defendant guilty or the special circumstances true solely to avoid having to make a decision on the death penalty; whether she would automatically vote for life imprisonment without the possibility of parole; and whether she would automatically vote for the death penalty. She created and checked a box labeled "not sure" when asked whether she could personally vote for the death penalty if the facts warranted it, and commented, "I am not sure if I could do this or not."

During questioning pursuant to *Hovey*, *supra*, 28 Cal.3d 1, Deborah B. confirmed that she was not philosophically opposed to the death penalty, but she had strong reservations about personally serving as a juror in a capital case. She said that she would not be able to vote for a death sentence if the aggravating factors substantially outweighed the mitigating factors and even if there were four murders, including two murders of children. When asked whether she would be willing to serve as a juror in a capital case, she responded, "I would. But like I told

him I probably couldn't.  You know, I'm just being truthful.  And the more I thought about it the whole week that I been here and then came back, I just kept confirming that in my mind.  I'm a teacher, and I deal with children every day.  I just — I just couldn't play that role.  Even though maybe I did feel that's what he deserved, that's not my right I feel for myself.  Maybe other people feel they could do that, and that's fine.  And maybe that's what he did deserve, but I in my heart could not do that.  I would be a hold up or — I just couldn't do that."

When asked whether she would listen to and follow the trial court's instructions, she responded, "Absolutely."  When asked whether she could, as opposed to would, vote for the death penalty if the aggravating circumstances outweighed the mitigating circumstances, she responded, "I mean is it my right to be able to vote no?  I mean I just couldn't do that.  I couldn't in my heart.  That's — I couldn't unless that was the law.  Because the law says if the evidence is — if the evidence was there, and that was something I had to do, then I guess I would have to do it."

She then confirmed that there was no conceivable set of facts under which her view would allow her to vote for the death penalty, explaining, "It's just really hard.  I know if it was my own children, and this happened to them, then of course I would say yes I could.  And I would want that for my own family.  But that's not the situation right now.  This is something completely different.  And I don't think I — even though I felt he was guilty, and he deserved a punishment, that that could be up to me to give to him."  She agreed that her view was essentially "there is no reason to put on a penalty phase because [she] wouldn't listen to or weigh the aggravating and mitigating circumstances in any

meaningful way because whatever ended up happening [she'd] be voting for life without parole rather than death anyway."

The trial court excused Prospective Juror Deborah B. over the defense's objection. The court stated, "I couldn't get one iota of willingness to impose the death penalty in this or any other case." The court continued, "In evaluating her demeanor she was completely certain when she answered the question she was asked about whether she could impose a death sentence. I am entirely satisfied that this is a person who would not be able to follow the court's instructions to evaluate the evidence, and only reach a decision as to death or life without parole after having done so. This is a person who would not be able to impose a death sentence no matter what case was before her."

The trial court did not err. Although Deborah B. supported the death penalty in theory, she gave equivocal responses in her questionnaire about her ability to impose it. She then said during *Hovey* questioning that she would not be able to vote for a death sentence if the aggravating factors substantially outweighed the mitigating factors and even if there were four murders, including two murders of children. She agreed that her view was essentially "there is no reason to put on a penalty phase because [she] wouldn't listen to or weigh the aggravating and mitigating circumstances in any meaningful way because whatever ended up happening [she'd] be voting for life without parole rather than death anyway." To the extent Juarez argues that the trial court erred because Deborah B. said she would follow the law, we disagree. She said that she could not vote for the death penalty "unless that was the law . . . and that was something [she] had to do." But a "prospective juror's statement that he thought he could vote for death 'if [he] had to' would not necessarily have established that,

25

contrary to the trial court's finding, he could perform his duties as a juror. Clearly, a juror is never *required* to vote for the death penalty." (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 401.) We therefore find that substantial evidence supports the trial court's excusal of Deborah B.

## C. Denial of Challenges for Cause

Juarez contends that the trial court erred in denying his challenges for cause of 16 prospective jurors who, he claims, were biased in favor of the death penalty. "[T]o preserve this claim for appeal we require, first, that a litigant actually exercise a peremptory challenge and remove the prospective juror in question. Next, the litigant must exhaust all of the peremptory challenges allocated by statute and hold none in reserve. Finally, counsel (or defendant, if proceeding pro se) must express to the trial court dissatisfaction with the jury as presently constituted." (*People v. Mills* (2010) 48 Cal.4th 158, 186.)

Juarez failed to preserve his claim for appeal. He exercised peremptory challenges against only six of the 16 prospective jurors. He did not exhaust all of his peremptory challenges as to the main jury panel, although he did as to the alternate panel. Nor did he express dissatisfaction with the jury to the trial court. Indeed, he does not deny these facts but rather urges us to set aside the forfeiture rule. We have previously declined to do so (*People v. Manibusan* (2013) 58 Cal.4th 40, 61), and he provides no persuasive reason for us to do so here.

## III. INTERPRETER ISSUES

Juarez contends that "shoddy and inaccurate interpretative and translation assistance and services" violated his state constitutional right "to an interpreter throughout the

proceedings" (Cal. Const., art. I, § 14) and to his state and federal constitutional rights to due process, to be present during trial, to confront witnesses, and to a reliable process and sentence.

## A. Issues Regarding Y.M.'s Preliminary Hearing Testimony

Juarez challenges the use of an unsworn, uncertified interpreter, Ximena Oliver, to interpret Y.M.'s testimony at the preliminary hearing.

In general, interpreters are required to take an oath and to be certified. (Evid. Code, § 751, subd. (a); Gov. Code, § 68561, subd. (a).) A trial court, however, may use an interpreter who is not certified if there is "good cause" to do so. (Gov. Code, § 68561, subd. (a).) In that situation, the court must find, among other things, that good cause exists and that the interpreter is qualified to interpret the proceedings. (See Cal. Rules of Court, rule 2.893 [formerly rule 984.2].)

It is uncontested that Oliver was neither sworn nor court-certified, except with respect to administrative hearings. When Juarez moved to dismiss the information on these grounds, the trial court denied the motion. The court found that Juarez had not waived his right to her oath or certification, but he had waived any issues as to the accuracy or competency of her interpretation and there was no prejudice.

"Improper procedures in the use of an interpreter do not rise to the level of a constitutional violation unless they result in prejudice demonstrating defendant was denied his right to a fair trial." (*People v. Superior Court* (*Almaraz*) (2001) 89 Cal.App.4th 1353, 1360; see *id.* at pp. 1359–1360 [failure to follow procedural requirements or administer oath for an

interpreter alone does not deprive a defendant of the constitutional right to an interpreter].) Further, "a conviction will not be reversed because of errors or irregularities that occurred at a preliminary hearing or grand jury proceeding, absent a showing that the asserted errors 'deprived [the defendant] of a fair trial or otherwise resulted in actual prejudice relating to [the] conviction.' " (*People v. Carrington* (2009) 47 Cal.4th 145, 178; *People v. Estrada* (1986) 176 Cal.App.3d 410, 414, 416 [applying standard and finding no prejudice as a result of a noncertified interpreter having served as defendant's personal interpreter at the preliminary hearing].)

We see no prejudice here. At the time of Oliver's interpretation, Juarez had an independent interpreter. Oliver's interpretation contained some errors, but defense counsel represented that a certified interpreter had listened to Oliver's interpretation and determined it to be "guardedly acceptable." And more importantly, Y.M. testified at trial, and Juarez acknowledges that any "[p]rejudice was restricted to the preliminary hearing, and could have been cured by subsequent trial testimony."

Juarez next challenges the use of his interpreter to translate an outburst at the preliminary hearing and his absence when his interpreter did so. While Y.M. testified, the prosecutor remarked that she was "obviously upset" and asked for a break. The court declared a recess until the next morning. The court then reconvened and stated for the record that Y.M. had yelled something in Spanish. The court believed her statements were made shortly after the recess, but there was some dispute about their timing relative to the recess.

When the court reconvened, counsel and Juarez's interpreter, Terri Bullington, were present, but he was not. The court initially asked Bullington to interpret Y.M.'s statements, but defense counsel asked that Oliver instead interpret them. After clarifying that Oliver was in the building, the court agreed. The court asked whether defense counsel wanted Juarez there, and upon learning that he was not in the building, defense counsel agreed to make a record and catch him up. Oliver then interpreted Y.M.'s statements. While doing so, Oliver said that "[u]nless the other interpreter knows," she did not know how to interpret the word "desgraciado." Bullington remarked, "That caught me, too. Like 'a horrible person.'" Oliver elaborated about that word and ultimately summarized that Y.M. had said, "damn you" three times; "desgraciado" twice; "I hope you burn in hell"; and "I cannot take this any longer." The court said that unless counsel wished to address anything, it would recess and repeat this interpretation the next day. The court then said, "Ms. Bullington?" Bullington said, "I can add two things. She also said, 'I hate you' and she said, 'Why?'" The court asked whether Bullington could add anything else, and Bullington said that she agreed with Oliver's interpretation. The next morning, defense counsel confirmed that Bullington had translated a transcript of this session to Juarez.

Juarez moved to dismiss the entire action, arguing that his absence from and Bullington's involvement in this session violated his rights. The trial court denied the motion. The court explained that the bailiff had loaded him immediately into the transport van for his security after Y.M. had yelled and two courtroom spectators had leaned forward and tried to say something to him. Despite his absence, the court had thought that Y.M.'s statements should be interpreted "while memories

were freshest." The court concluded that this was not a critical stage of the proceedings. The court further explained that it initially asked Bullington to interpret Y.M.'s statements because it believed Oliver had left. But after learning otherwise, the court asked for Oliver's interpretation. Bullington then volunteered a couple of comments about that interpretation. The court concluded that this did not compromise Juarez's relationship with her. The court ultimately struck Y.M.'s statements from the record. When Juarez subsequently moved to dismiss the information on these grounds, the trial court denied the motion, finding that he was present during all testimony in support of the charges, that Bullington's involvement "did not deny [him] his right to a dedicated interpreter," and that he suffered no prejudice.

" 'A criminal defendant's right to be personally present at trial is guaranteed under the federal Constitution by the confrontation clause of the Sixth Amendment and the due process clause of the Fourteenth Amendment. It is also required by section 15 of article I of the California Constitution and by sections 977 and 1043.' [Citation.] 'Under the Sixth Amendment, a defendant has the right to be personally present at any proceeding in which his appearance is necessary to prevent "interference with [his] opportunity for effective cross-examination." ' [Citation.] 'Due process guarantees the right to be present at any "stage that is critical to [the] outcome" and where the defendant's "presence would contribute to the fairness of the procedure." ' [Citation.] ' "The state constitutional right to be present at trial is generally coextensive with the federal due process right. [Citations.]" [Citation.] Neither the state nor the federal Constitution, nor the statutory requirements of sections 977 and 1043, require the

defendant's personal appearance at proceedings where his presence bears no reasonable, substantial relation to his opportunity to defend the charges against him. [Citations.]' [Citation.] 'Defendant has the burden of demonstrating that his absence prejudiced his case or denied him a fair trial.' " (*People v. Blacksher* (2011) 52 Cal.4th 769, 798–799, fn. omitted (*Blacksher*).)

Here, Juarez was present until the court recessed. He was absent when Oliver interpreted Y.M.'s outburst. The outburst occurred at the preliminary hearing, possibly after the court recessed; it did not respond to a question or describe the crimes with which he was charged, and it was ultimately struck from the record. We conclude that his presence "was not necessary for effective cross-examination or to contribute to the fairness of the procedure. His absence did not deprive him of the full opportunity to defend against the charges." (*Blacksher*, *supra*, 52 Cal.4th at p. 799.) In any event, it was harmless beyond a reasonable doubt. (*Mendoza*, *supra*, 62 Cal.4th at p. 902 [federal constitutional error " 'pertaining to a defendant's presence is evaluated under the harmless-beyond-a-reasonable-doubt standard' "].) Bullington translated the transcript to him, and he "suggests nothing counsel might have done differently had he been able to consult with [him]" at the session. (*People v. Butler* (2009) 46 Cal.4th 847, 864.) We thus conclude that Juarez fails to show how his absence "affected his ability to defend himself or otherwise prejudiced his case." (*Blacksher*, at p. 800.)

We further conclude that Bullington's involvement in the session did not violate Juarez's rights. "A person unable to understand English who is charged with a crime has a right to an interpreter throughout the proceedings." (Cal. Const., art. I,

§ 14.)   "The California Constitution, as interpreted by the California Supreme Court, makes it clear that a defendant is entitled to two interpreters, one to interpret the witnesses' testimony and the other to be the personal interpreter for the defendant."   (*People v. Estrada*, *supra*, 176 Cal.App.3d at p. 415.)   Here, Oliver interpreted Y.M.'s statements.   Oliver prompted Bullington to assist in defining one word, and Bullington added to Oliver's interpretation.   This assistance did not deprive Juarez of his right to an interpreter.   (Cf. *People v. Aguilar* (1984) 35 Cal.3d 785, 793 [separate defense interpreter may " 'serve to ensure the accuracy of . . . witness interpreters' "].)   Moreover, even if we assume that a violation occurred, it was harmless beyond a reasonable doubt.   (See *People v. Rodriguez* (1986) 42 Cal.3d 1005, 1010–1012.)   There is nothing in the record to show that his "ability to communicate [with Bullington] or comprehend was impeded" (*id.* at p. 1014; see *id.* at pp. 1014–1016) or that he was otherwise prejudiced or deprived of a fair trial (*People v. Carrington*, *supra*, 47 Cal.4th at p. 178).

### B. The Courtroom Audio Equipment

Juarez contends that the courtroom audio equipment in Placer County and Napa County "prejudicially interfered with proper interpretative assistance."   He argues that counsel, witnesses, and interpreters expressed difficulty hearing throughout the proceedings.   He also points out issues with Y.M.'s testimony.

At the preliminary hearing, Y.M. did not use a microphone, but her interpreter did.   At trial, Y.M. used a microphone and her testimony was recorded, but she spoke "very, very quietly."   After her trial testimony on March 14,

2001, defense counsel told the court the following morning that they could not hear her "at all yesterday, basically," that they "were having some difficulty with translation," and that Juarez "was having difficulty following." Defense counsel requested that Juarez listen to Y.M.'s testimony in Spanish rather than have his interpreter interpret it for him. He confirmed that he preferred this approach and added, "If she could raise her voice so I could hear what she says because yesterday I couldn't hear anything." The court granted the request and provided her an additional microphone.

Trial courts should endeavor to ensure that all participants can adequately hear the proceedings, making appropriate use of technology. Our review of the record here reveals that the acoustics and audio equipment in the proceedings were poor. But the record also reflects that counsel, witnesses, and interpreters routinely interrupted the proceedings to express their difficulty hearing and to request clarification, which they received. Juarez does not claim on appeal that the trial court denied any request he made to clarify the proceedings or otherwise minimize the hearing difficulties.

As to Y.M.'s March 14 testimony, defense counsel expressed difficulty hearing and requested clarification, which he received, a couple times. It was not until the next day that defense counsel said they could not hear Y.M. "at all yesterday, basically." Had defense counsel raised the issue sooner, the court could have remedied the issue sooner. And once defense counsel raised the issue, the court accommodated the defense's requests. Moreover, there is little in the record to suggest that Y.M.'s interpreter could not hear her or accurately interpret her testimony into English, or that Juarez's interpreter could not hear Y.M.'s interpreter or accurately translate her

interpretation into Spanish, except for defense counsel's reference the next day to "some difficulty with translation." We are unable to conclude on this record "that the hearing difficulties adversely affected the defense, or prejudiced defendant in any way." (*People v. Freeman* (1994) 8 Cal.4th 450, 479–480.)

### C. The Accuracy of Interpreters

Juarez argues that the interpreter Valdes made errors during Juarez's interrogation on July 16, 1998 in Placer County, that the transcript of the same interrogation contained additional errors, and that the trial court erred in denying his motion for a mistrial on these grounds. Juarez further argues that Valdes should not have served as the interpreter for both him and the interrogators.

" 'A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions.' " (*People v. Hines* (1997) 15 Cal.4th 997, 1038.)

We conclude that the trial court did not abuse its discretion by determining that any prejudice here was curable. An interpreter testified that despite some errors, Valdes's interpretation retained its integrity, and there was adequate communication during the interrogation. The court found only one significant error in the transcript and concluded that it was "imminently [*sic*] correctable." The court told the jury that the transcript contained transcription inaccuracies and that the tape, not the transcript, was the evidence. As to the one significant error, the court told the jury, "On page 44 of the

transcript the defendant was asked the question: [¶] 'Why didn't you kill her? You were going to come back and kill her?' [¶] And the transcript indicates that his answer was, 'No. First I was going to take her to see the children.' [¶] When it comes time to evaluating the tape, listen carefully to that answer, for example, because you may find that the actual answer is, 'No, well, first I was going to take the children,' which is significantly different." Later, the defense also presented testimony to the jury about interpretation and transcription errors in the interrogation. Considering these circumstances, we conclude that the alleged errors related to his interrogation did not violate his constitutional rights or deprive him of a fair trial.

Juarez next argues that there were other interpretation errors "throughout this record," citing as examples three instances in which interpretations were incorrect or clarified. To the extent he raises for the first time on appeal errors committed by witness interpreters, he has forfeited his claim. (*People v. Romero* (2008) 44 Cal.4th 386, 411.) In any event, he fails to show that any errors violated his rights or prejudiced him.

Finally, he contends that the trial court erred in denying his request for a supplemental "check" interpreter. The court denied his request because he failed to show his need for such an interpreter, but the court did permit him to tape-record the testimony of Spanish-speaking witnesses. On appeal, he argues that he needed a "check" interpreter because "[c]ounsel were in no position themselves to know when translations were full and accurate, and the issue had been a recurring one." He relies on *People v. Aranda* (1986) 186 Cal.App.3d 230, 237, which stated, "When a showing is made, at trial, that an interpreter may be biased or his skills deficient, one solution may be appointment

of a 'check interpreter.'" But Juarez did not make such a showing; thus the court did not err.

## IV. GUILT PHASE ISSUES

### A. Denial of Motion to Suppress

Juarez contends that the trial court erred in denying his motion to suppress evidence seized from his trailer. Admitting this evidence, he contends, violated his Fourth Amendment rights and his state and federal constitutional rights to a fair trial, due process, and a reliable penalty determination.

#### 1. Searches of Trailer on July 12

Shortly after arriving at the Parnell Ranch on July 12, Deputies Walker and Reed entered Juarez's trailer to look for him and the missing family members. They were inside the trailer for "[p]robably less than two minutes." They "lifted up things, looked underneath things, opened up cupboards," and opened up "anything and everything . . . that somebody could hide in." Deputy Walker saw some duct tape and "something to indicate that somebody had been tied up." When he went into the bed area, "[i]mmediately [he] could see there was ammunition for various guns, rifles, all around." Deputy Reed found two rifles in the bed area, one under and one above the bed. They seized the rifles but nothing else. Deputy Walker testified that they seized the rifles for safekeeping because the Parnell Ranch was "such a big area, 160 acres," they were concerned Juarez might come back to the trailer, and they did not want the rifles to "be used against [them] or anyone else." Upon exiting, they did not place crime scene tape or a deputy at the trailer door because they did not have "enough manpower at that point." They also searched the yard surrounding the trailer.

Around 11:45 p.m. that night, Detective Summers and Deputy Owens entered Juarez's trailer in an effort to locate identifying information about him and the missing family members. Detective Summers testified that he was inside for approximately three minutes, but Deputy Owens guessed that he was inside for 10 or 15 minutes. Detective Summers saw some duct tape, ammunition, and cord, among other things. He picked up a checkbook cover and found José's driver's license inside it. He seized the license and two envelopes containing vehicle registration and tax records.

At the suppression hearing, Detective Summers explained that before he entered the trailer, he had limited information about the identities of the suspect and the missing family members. In particular, there was some confusion as to whether the suspect's name was Arturo Suarez or Arturo Juarez. Other witnesses testified about the identifying information known that night. Some suggested it was limited; some suggested otherwise.

The Placer County trial court denied the motion to suppress evidence seized during these warrantless entries. The court concluded that Juarez abandoned his trailer because he fled the crime scene, was located "several hundred miles away," and did not intend to return. Accordingly, there was no requirement for a warrant. In addition, the court concluded that Deputy Reed's entry was a "legitimate protective sweep." The court found that "it was clear that there was no entry with the purpose of searching, but rather [there was] a protective or a body search . . . simply searching for people." "It was a quick walk-through," and it was justified by "unquestionably" exigent circumstances because "[t]here was a fresh report of a violent assault" and the suspect and the family members, including

children, were missing.  The court concluded that when the officers "noticed the rifles," the rifles were appropriately seized "as a matter of public safety since the defendant . . . from the officer's point of view could return to the residence and use the weapons offensively."

The court further concluded that Detective Summers's entry was justified by exigent circumstances because the suspect and the family members remained missing.  The court found that "[t]estimony is, frankly, confused on the point at which the defendant's full identity was determined by the police."  But the court found that "it was clear, at least in Detective Summers's mind, that he was seeking verification of the identity" given that "he did not conduct a general search of the premises but simply went to the property for the very superficial walk-through" and seized items that "obviously contained elements of identity."  As to this last part, the defense renewed the motion to suppress on the ground that trial testimony regarding what identifying information was known that night affected the ruling.  The Napa County trial court concluded that there was no need for a reopened hearing because the testimony "does nothing to undercut the ruling itself that the defendant had abandoned" the trailer.

" ' "In ruling on a motion to suppress, the trial court must find the historical facts, select the rule of law, and apply it to the facts in order to determine whether the law as applied has been violated.  We review the court's resolution of the factual inquiry under the deferential substantial-evidence standard.  The ruling on whether the applicable law applies to the facts is a mixed question of law and fact that is subject to independent review." ' "  (*People v. Bryant, Smith and Wheeler*, *supra*, 60 Cal.4th at p. 364.)  " '[W]e consider the correctness of the trial

court's ruling *itself*, not the correctness of the trial court's *reasons* for reaching its decision.'" (*Id.* at pp. 364–365.)

A warrantless entry into a home is a violation of the Fourth Amendment unless an exception to the warrant requirement exists. (See *Florida v. Jardines* (2013) 569 U.S. 1, 6 ["[W]hen it comes to the Fourth Amendment, the home is first among equals."].) " 'A long-recognized exception to the warrant requirement exists when "exigent circumstances" make necessary the conduct of a warrantless search. . . . " '[E]xigent circumstances' means an emergency situation requiring swift action to prevent imminent danger to life or serious damage to property, or to forestall the imminent escape of a suspect or destruction of evidence." ' " (*People v. Panah* (2005) 35 Cal.4th 395, 465.)

We conclude that the trial court did not err in denying the motion to suppress the rifles. There were exigent circumstances justifying Deputy Reed's entry. Juarez had recently attacked Y.M. in his trailer. When law enforcement officers arrived at the Parnell Ranch, Y.M. appeared "[v]ery upset," bloody, and "extremely swollen." Juarez remained at large, and the family members, including a three-year-old child and a five-year-old child, were missing. Law enforcement officers thought that Juarez might return to the trailer, and they did not know whether the missing family members also might be in the trailer. (See *People v. Panah, supra*, 35 Cal.4th at p. 466 [exigent circumstances justified entry into an apartment to look for a missing child].) Once inside the trailer, Deputies Reed and Walker conducted a "quick walk-through," and Deputy Reed properly seized the rifles to prevent Juarez from using them "against [law enforcement] or anyone else." (See *Warden v. Hayden* (1967) 387 U.S. 294, 298 [exigencies justified police

entering home, searching for the suspect and any weapons that he had used or might use against them, and seizing weapons found in a toilet flush tank and a clip of ammunition found under a mattress]; *People v. Ngaue* (1992) 8 Cal.App.4th 896, 904 [seizure of gun "was justified for officer safety" while suspect remained at large].)

Whether exigent circumstances justified Detective Summers's entry approximately two hours later to search for identifying information presents a closer issue. But any error in the trial court's denial of the motion to suppress evidence seized during that entry was harmless beyond a reasonable doubt. The only evidence seized during that entry concerned the identities of Juarez and José. There was no dispute as to their identities and thus no prejudice as to this evidence. In light of our conclusions, we need not decide whether Juarez abandoned his trailer before the warrantless entries.

### 2. *Search of Trailer on July 13*

Detective Carrington sought a search warrant on July 13. In her eight-page affidavit, she said she had spoken to Detective Summers and Detective Stewart. She learned that Juarez lived in a trailer and that he had attacked Y.M., dragged her inside, restrained her with duct tape and twine or rope, and raped her. Y.M.'s injuries "were consistent with choking, beating, and sexual assault." Y.M.'s husband, brother-in-law, and children were missing after having last been with Juarez. When deputies responded to her 911 call, they searched Juarez's trailer and seized two rifles. Detective Summers also searched it; he found José's identification in a checkbook and saw duct tape, twine or rope, scissors, aluminum foil, ammunition, and a tennis shoe in

the trailer. Judge Kearney issued the warrant. Detective Carrington searched the trailer, its screened porch, and yard.

The trial court denied the motion to suppress evidence seized pursuant to this warrant. The court again concluded that the trailer had been abandoned. In addition, the court concluded that there was probable cause to search it. The court found that the affidavit contained "obviously reliable police information," which came largely from Detective Carrington speaking with Detective Summers. The court further concluded, "even if you were to excise all of the information obtained by Detective Summers, there's enough other information in the warrant that would allow it to stand on its own merits." Moreover, even if there was "some technical defect of the warrant," Detective Carrington acted in good faith. Finally, the court concluded that the warrant encompassed the yard surrounding the trailer because it was "clearly part of the curtilage of the property," but "[e]ven if there was some question regarding the search of the yard, virtually all of the evidence was in plain view and certainly there was no reasonable expectation of privacy being out in the yard and subject to view by anyone."

On appeal, Juarez contends that the search of his trailer was unlawful because he did not abandon the trailer and the affidavit relied on hearsay and information obtained during earlier entries. He also contends that, even if valid, the warrant did not authorize a search of the yard or specify with particularity the items to be seized from the yard.

We conclude that the affidavit established probable cause. The description of Y.M.'s attack in the trailer, together with her injuries, made "it substantially probable that there was specific

property lawfully subject to seizure presently located in" the trailer. (*People v. Scott* (2011) 52 Cal.4th 452, 483.) The fact that Detective Carrington learned this information after speaking to Detective Summers and Detective Stewart does not eviscerate the probable cause. (Cf. *United States v. Ventresca* (1965) 380 U.S. 102, 108 ["Thus hearsay may be the basis for issuance of the warrant 'so long as there [is] a substantial basis for crediting the hearsay.' "]; *People v. Gonzales* (1990) 51 Cal.3d 1179, 1206, fn. 3 ["a fellow officer's observations, reported by the affiant as hearsay, are competent and presumptively reliable"].) Nor was it improper to include in the affidavit information about Deputy Reed's warrantless entry into the trailer. (Cf. *People v. Redd* (2010) 48 Cal.4th 691, 722 [affidavit can include information obtained during prior, lawful warrantless searches].) And even if the information about Detective Summers's warrantless entry was excised from the affidavit, it would still establish probable cause given the description of Y.M.'s attack in the trailer, together with her injuries. (See *People v. Williams* (1988) 45 Cal.3d 1268, 1303 ["It is the general rule that if probable cause clearly remains after tainted information is excised from the affidavit, a warrant is still valid."].)

We further conclude that evidence was properly seized from the yard, an area surrounding the trailer and enclosed by a wire fence. The warrant authorized a search of "the premises located at and described as: [¶] A silver single wide Spartan trailer license AB8476 wit [*sic*] a wooden screened porch on the Parnell Ranch" at an address on Mount Vernon Road in Auburn, County of Placer, California. Because the warrant authorized a search of this residence, it "also authorize[d] without so stating the search of the residence's curtilage." (*U.S. v. Gorman* (9th

Cir. 1996) 104 F.3d 272, 273; see also *People v. Smith* (1994) 21 Cal.App.4th 942, 950 [" '[A] warrant to search "premises" located at a particular address is sufficient to support the search of outbuildings and appurtenances in addition to the main building when the various places searched are part of a single integral unit.' "]; LaFave, Search and Seizure (5th ed. 2018) § 4.10(a), pp. 932–934.) In any event, several of the items in the yard were in plain view as Detective Carrington approached the trailer to execute the warrant and accordingly could be seized. (See *People v. Carrington, supra*, 47 Cal.4th at p. 166.)

We thus conclude that the trial court did not err in denying the motion to suppress evidence seized pursuant to the warrant. In light of our conclusion, we again need not decide whether Juarez abandoned his trailer before this evidence was seized.

### B. Admission of Confessions

Juarez contends that his confession on July 15 and all subsequent statements should have been suppressed because he was not advised of his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*) and the Vienna Convention on Consular Relations, April 24, 1963, 21 U.S.T. 77, T.I.A.S. No. 6820 (Vienna Convention) and because his statements were involuntary.

#### 1. *Background*

Juarez was arrested on July 15, 1998, around 8:40 p.m. He was "[v]ery calm, very quiet, [and] very cooperative." Around 9:15 p.m., Detective Robbins and FBI Special Agent Stevens, who spoke Spanish, drove him to the Long Beach police station. During the drive, Juarez asked Agent Stevens what he was being arrested for or something to that effect, and she told him that he was being arrested for the murder of four people and the

rape of a female.  He said he did not rape the woman.  She said those were serious charges; Juarez did not respond.  He then asked how they found him or something to that effect, and she said that "he placed a telephone call."  At some point, he commented that she spoke Spanish and that he was going to Mexico.  She asked where he was from in Mexico; when he told her, she said her family was from Mexico.  They arrived in Long Beach around 9:20 or 9:30 p.m.

Around 10:10 p.m., in an interview room at the Long Beach police station, Juarez asked what were the charges against him, and Agent Stevens told him that he was being charged with four counts of murder and one count of rape.  He said he did not rape the female.  She asked whether he was willing to talk to them about the events, and he said the homicides or the murders were true.  He said that he had seen the news and that the homicides were true but he did not rape the woman.  She asked whether he was willing to talk to them about the events, and he said he was.

She said they needed to advise him of his rights and asked if he read in Spanish; he said he did.  She gave him an advisement form, and he read it.  She then read it to him and, after each line, asked whether he understood or had questions; he said he understood and did not have questions.  She asked if he was willing to give up his rights and speak to them, and he signed the form without hesitation.

Translated into English, the form, titled "Consideration of Civil Rights," stated:  "I, Arturo Juarez Suarez, have been informed about my civil rights as follows."  "I have the right to remain silent."  "Anything [I] say will be used and can be used against [me] in a court of law."  "I have a right to speak to an

attorney and have him present with me while being interrogated." "If I can't pay to contract an attorney, one will be assigned to represent me before the interrogation, if I desire one." "I understand every one of these rights that have been explained before, and I wish to discuss the case with the officer." "Any declarations that I make at this moment are free and voluntary without any promises of indulgence, severity or compensation."

After Juarez signed the form, Detective Robbins and Agent Stevens questioned him. Detective Robbins asked most of the questions, while Agent Stevens acted as an interpreter. Juarez said that during an argument, he shot and killed his two brothers-in-law and put them in a hole; he tied up and beat the woman; and he beat the two children, put them in the hole, and threw dirt on them. He was "[v]ery calm, quiet, cooperative, [and] speaking very clearly." He did not indicate that he wanted a lawyer, did not want to talk, or did not understand the questions.

The interrogation ended around 11:20 p.m. Afterward, Agent Stevens asked whether he was cold because she was "freezing"; when he indicated he was, she gave him a shirt. She did not recall providing him with anything to drink or eat, but believed they might have offered him something to drink, which he declined. He did not indicate that he was hungry or express any other discomfort.

Around 1:00 a.m., Detective Bennett and Sergeant McDonald transported Juarez to Placer County by plane. He was "[v]ery calm, extremely cooperative [and] [m]aybe a little sleepy." He slept for "a good part" of the flight but did not eat. Upon arrival, he was booked. Sergeant McDonald did not know

whether he ate during booking but testified that there would have been food available. Sergeant McDonald also recalled telling him in English that they would talk later that day, to which he said okay or something to that effect.

Around 11:00 a.m. on July 16, Detective Bennett and Sergeant McDonald interrogated Juarez with the assistance of an interpreter. The interrogation was videotaped and lasted approximately two hours. During the interrogation, he was calm, and he was offered a soda and pizza.

At the beginning of the interrogation, Sergeant McDonald showed Juarez the form he had signed the day before and asked whether he recalled and understood it and whether they could talk. Juarez nodded his head as Sergeant McDonald asked these questions. He subsequently admitted that he shot José and Juan during an argument; that he beat and tied Y.M. and touched her vagina; and that he hit the children and put them in the hole.

Near the end of this interrogation, Sergeant McDonald asked Juarez to confirm that he remembered the form he had previously signed regarding his rights, which he did. Sergeant McDonald asked him to describe his rights, and Juarez replied, "That I don't understand anything." Sergeant McDonald responded that Juarez had read, signed, and said he understood the form. Juarez replied, "I cannot understand what rights I can have." Sergeant McDonald then asked whether Juarez knew, when they began their conversation, that he had the right to remain silent; Juarez replied, "Yes." Sergeant McDonald asked whether Juarez understood, when they began their conversation, that he had the right to talk to an attorney; Juarez replied, "Yes." Sergeant McDonald asked whether Juarez

understood that he had the right to talk to an attorney before he talked to them; Juarez replied, "Yes." Sergeant McDonald asked whether Juarez decided to talk to them; Juarez replied, "Yes." Sergeant McDonald asked, "Because you wanted to and you didn't want to talk to an attorney?" and Juarez replied, "What am I going to gain by talking to a lawyer?" Sergeant McDonald said, "Okay. Again, there's nothing else you want to ask?" Juarez did not reply. After Detective Bennett asked about how the family can heal from this, Sergeant McDonald asked why Juarez decided to talk "in Long Beach" and "today." Juarez said that he would have felt "very bad" if he did not talk. Juarez then asked when he would go to court. The interpreter responded to him. After receiving permission to do so, the interpreter also briefly explained to him what to expect for the first court appearance. The interpreter then said something about his not understanding the justice system, to which Detective Bennett said, "We still don't."

The next morning, Sergeant McDonald and other law enforcement officials took Juarez on a walk-through at the Parnell Ranch, which lasted for about 15 or 20 minutes. The walk-through was taped, although only some sound was discernible. Juarez was shackled, but he appeared cooperative and relaxed. A sheriff's department employee, Virginia Ferral, spoke Spanish and acted as an interpreter, but she was not a certified interpreter and did not translate her conversations verbatim.

Ferral testified that she asked Juarez, "Do you remember the rights that were discussed and the right to an attorney?" He said, "Yes." He then asked, "Can I have an attorney here?" She testified that Sergeant McDonald told her to say words to the effect of "it's up to you," and she told Juarez "if you want." Ferral

47

testified that Juarez then expressed concern about his safety in jail because some inmates wanted to kill him. The court found that "[i]t is unclear from the record which phrase was said or translated to [him], but it's clear that [he] asked for nothing further regarding an attorney but turned to security concerns."

Ferral testified that in response to his question about security, she told him she understood but wanted to know whether he would do this walk-through. She also told him that they and the jail staff were obligated to protect him, that they could move him to another place, and that they would talk to the person in charge of the jail. The group then proceeded with the walk-through.

That afternoon, Juarez was arraigned, and the prosecutor advised him of his rights under the Vienna Convention. Juarez said, "What for?" After conferring with him, defense counsel said, "I believe at this time we would like to wait. [¶] We would not request any such notification right now."

### 2. *Asserted Violation of* Miranda *and Voluntariness*

" ' "As a prophylactic safeguard to protect a suspect's Fifth Amendment privilege against self-incrimination, the United States Supreme Court, in *Miranda*, required law enforcement agencies to advise a suspect, before any custodial law enforcement questioning, that 'he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." ' " (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1085–1086.) " ' "Critically, however, a suspect can waive these rights." [Citation.]' [Citation.] 'The waiver must be "voluntary in the sense that it was the product

of a free and deliberate choice rather than intimidation, coercion, or deception" [citation], and knowing in the sense that it was "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." ' " (*Id.* at p. 1086.)

" ' The Fourteenth Amendment of the federal Constitution and article I, section 7 of the California Constitution make "inadmissible any involuntary statement obtained by a law enforcement officer from a criminal suspect by coercion." ' [Citation.] The prosecution must prove by a preponderance of the evidence that a defendant freely and voluntarily gave police statements before the statements can be admitted. [Citation.] ' "Voluntariness does not turn on any one fact, no matter how apparently significant, but rather on the 'totality of [the] circumstances.' " ' [Citation.] The test considers several factors, including any element of police coercion, the length of the interrogation and its location and continuity, and the defendant's maturity, education, and physical and mental health. [Citation.] The determinative question ' "is whether defendant's choice to confess was not 'essentially free' because his will was overborne." ' " (*People v. Peoples* (2016) 62 Cal.4th 718, 740.)

"On appeal, we review independently the trial court's legal determinations of whether a defendant's statements were voluntary [citation], whether his *Miranda* waivers were knowingly, intelligently, and voluntarily made [citation], and whether his later actions constituted an invocation of his [rights] [citation]. We evaluate the trial court's factual findings regarding the circumstances surrounding the defendant's statements and waivers, and ' "accept the trial court's resolution of disputed facts and inferences, and its evaluations of

49

credibility, if supported by substantial evidence." ' " (*People v. Rundle* (2008) 43 Cal.4th 76, 115.) When "an interview is recorded, the facts surrounding the admission or confession are undisputed and we may apply independent review." (*People v. Leon* (2020) 8 Cal.5th 831, 843.)

### a. Confession in Long Beach on July 15

Juarez claims that his confession at the Long Beach police station should have been suppressed. The trial court concluded that he was advised of his rights, "appeared to understand his rights," and confessed "freely and voluntarily" after a "full and knowing waiver of his rights." The court found that "some of the words [in the advisement form] could have been better," but the discrepancies were "[a]t best" characterized as "insignificant" and "the substance of the *Miranda* rights were conveyed to [him] orally and in writing." The court also found, as to all of the interviews, that he was "calm and cooperative" and "readily appeared willing to talk to the police and to fully explain the circumstances of the crime"; there was no evidence "of discomfort or stress" or that "he was forced to sign anything or to waive his rights"; and all of the defense's arguments about his being "cold, tired or hungry are purely speculative. No evidence suggests that [he] actually was influenced by these factors."

We conclude that Juarez was adequately advised of his rights. The advisement form in question states that he has the right to remain silent, anything he says can and will be used against him in a court of law, he has the right to speak with an attorney and the right to have the attorney present while being interrogated, and if he cannot afford an attorney, one will be assigned for him before the interrogation if he so desires. Juarez

read the form, Agent Stevens read it to him, and Juarez said he understood and did not have any questions.

Juarez argues that the form was inadequate and misleading.  An interpreter, Santiago Flores, testified that the word "civil" in the form's title did not encompass criminal; the word "silencio" in the first sentence could mean "to be still [or] quiet"; the word "consultar," which means "to seek advice," should have been used to explain the right to an attorney, rather than "hablar," which means "to talk, to carry on conversation"; and the word "discutir" in the fifth sentence could mean "to discuss" or "to argue or debate."  The last sentence — "[c]ualquiera de las declaraciones que yo haga en este momento son libres y voluntarias, con ninguna promesa de indulgencia (severidad) o recompensa" — also could be interpreted in multiple ways.  When asked to translate this sentence, Flores translated it as "[a]ny declarations that I make at this moment are free and voluntary without any promises of indulgence, severity or compensation."  When defense counsel subsequently asked whether this sentence has more than one translation, Flores testified, "No, I don't believe so."  Following up, defense counsel asked whether this sentence could also mean "I can speak freely without any consequences as a result of my providing information."  Flores responded that "[i]t could" and elaborated, "If I — 'whatever declaration I make would be made without any punishment.'  It could mean that. 'I'm free to talk, but I won't be punished for it.' "  When the prosecutor subsequently asked Flores to translate this sentence again, Flores translated it as "[a]ny declarations that you are making at this moment are free and voluntary with no promise of indulgence, leniency, severity or compensation."  Finally, the signature line stated only "signature."

51

The high court has "never insisted that *Miranda* warnings be given in the exact form described in that decision." (*Duckworth v. Eagan* (1989) 492 U.S. 195, 202.) Rather, "[t]he inquiry is simply whether the warnings reasonably 'conve[y] to [a suspect] his rights as required by *Miranda*.'" (*Id.* at p. 203.) In *Duckworth*, the high court concluded that the warnings at issue "touched all of the bases required by *Miranda*. The police told respondent that he had the right to remain silent, that anything he said could be used against him in court, that he had the right to speak to an attorney before and during questioning, that he had 'this right to the advice and presence of a lawyer even if [he could] not afford to hire one,' and that he had the 'right to stop answering at any time until [he] talked to a lawyer.'" (*Ibid.*)

The advisement form in this case likewise touches all of the bases required by *Miranda*. It states that Juarez has the right to remain silent, anything he says can and will be used against him in a court of law, he has the right to speak with an attorney and the right to have the attorney present while being interrogated, and if he cannot afford an attorney, one will be assigned for him before the interrogation if he so desires. The trial court found that "some of the words [in the advisement form] could have been better," but the discrepancies were "[a]t best" characterized as "insignificant" and "the substance of the *Miranda* rights were conveyed to [him] orally and in writing." Although we agree that some of the words in the advisement form could have been more precise, "we are not persuaded . . . that the language was so ambiguous or confusing" that it did not reasonably convey his rights. (*People v. Wash* (1993) 6 Cal.4th 215, 236; cf. *U.S. v. Botello-Rosales* (9th Cir. 2013) 728 F.3d 865, 867 [*Miranda* warnings failed to reasonably

convey the defendant's right to appointed counsel because the warnings suggested that the right to appointed counsel would be "contingent on the approval of a request or on the lawyer's availability" and did not make clear that appointed counsel would be "without cost"].)

We further conclude that, after being advised of his rights, Juarez validly waived them and voluntarily confessed. "To establish a valid *Miranda* waiver, the prosecution bears the burden of establishing by a preponderance of the evidence that the waiver was knowing, intelligent, and voluntary under the totality of the circumstances of the interrogation." (*People v. Linton* (2013) 56 Cal.4th 1146, 1171.) In assessing whether the waiver was knowing and intelligent, relevant circumstances include " '(i) the defendant's mental capacity; (ii) whether the defendant signed a written waiver; (iii) whether the defendant was advised in his native tongue or had a translator; (iv) whether the defendant appeared to understand his rights; (v) whether the defendant's rights were individually and repeatedly explained to him; and (vi) whether the defendant had prior experience with the criminal justice system." (*U.S. v. Price* (9th Cir. 2019) 921 F.3d 777, 792.)

Juarez read the advisement form written in Spanish and Agent Stevens read it to him, asking him after each line whether he understood or had any questions. Although Juarez points out on appeal that he had spent his life "working in fields or pastures," there is no indication that he was incapable of understanding his rights. Having reviewed the advisement form, he said he understood and did not have any questions. He signed the form without hesitation and then actively engaged in the interrogation, providing an extensive account of the events. Agent Stevens acted as an interpreter during the interrogation.

She previously had translated between Spanish and English in her role as a law enforcement agent. She had learned Spanish from her mother, who was Mexican. Although she did not know whether there was a different dialect used in the region of Mexico where Juarez had lived, she testified that he spoke "very clearly," she "[n]ever" had any trouble understanding his responses, and at no point did he indicate that he did not understand the questions. Nor did he indicate that he did not want to talk. Rather, the trial court found that he "appeared to understand his rights" and "readily appeared willing to talk to the police and to fully explain the circumstances of the crime."

Nor do the circumstances he emphasizes amount to coercion. There was no suggestion of " 'physical intimidation,' " " 'coercive tactics,' " promises, or threats. (*People v. Spencer* (2018) 5 Cal.5th 642, 672; see *id.* at pp. 672–674.) When he said he was cold, he was given a shirt. He did not indicate that he was hungry or otherwise uncomfortable. Nor did he indicate that his nervousness or sleeplessness affected his ability to understand his rights or the questions. Instead, the trial court found that he was "calm and cooperative," and there was no evidence "of discomfort or stress" or that "he was forced to sign anything or to waive his rights." Finally, the fact that he lacked experience with the criminal justice system did not invalidate his waiver or render his subsequent statements involuntary in the circumstances here. (See *U.S. v. Bautista-Avila* (9th Cir. 1993) 6 F.3d 1360, 1364–1366 [finding valid waiver despite the defendant's lack of experience with the justice system].)

### b. *Confession in Placer County on July 16*

Juarez next claims that his confession in Placer County should have been suppressed. "Where a subsequent

interrogation is ' "reasonably contemporaneous" ' with the prior waiver, and the prior waiver was 'knowing and intelligent,' police need not undertake a *Miranda* readvisement.  [Citation.]  In determining whether a subsequent interrogation is reasonably contemporaneous, we consider the totality of the circumstances.  Relevant considerations include: '1) the amount of time that has passed since the initial waiver; 2) any change in the identity of the interrogator or location of the interrogation; 3) an official reminder of the prior advisement; 4) the suspect's sophistication or past experience with law enforcement; and 5) further indicia that the defendant subjectively understands and waives his rights.' " (*People v. Spencer, supra*, 5 Cal.5th at p. 668.)

The trial court concluded that the admonition provided approximately 14 hours earlier in the Long Beach interrogation was "reasonably contemporaneous with [the Placer County] interview."  The court found that at the beginning of the Placer County interrogation, Juarez "indicated that he recalled the rights given earlier; that he understood them, and that he agreed to talk."  At the end of the interrogation, Sergeant McDonald again discussed with Juarez the advisement form that Juarez had signed in Long Beach.  The court found that when Sergeant McDonald asked Juarez whether he understood his rights, Juarez "was unable to articulate his rights generally, but as to each individual right, [he] replied that he understood that he had the right to remain silent and the right to an attorney."  When Sergeant McDonald asked Juarez whether he decided to talk to the officers because he wanted to do so and did not want to talk to an attorney, Juarez responded, "What am I going to gain by talking to a lawyer?"  As to this response, the court found that it "indicates at least an understanding that the

right to an attorney exists, but [Juarez] made a conscious decision, perhaps unwise, not to exercise it."

Our review of the record confirms that approximately 13 or 14 hours elapsed between Juarez's waiver in Long Beach and his interrogation in Placer County, and he remained in custody during that time. At the beginning of the Placer County interrogation, Sergeant McDonald showed Juarez the advisement form he signed in Long Beach, and Juarez indicated that he recalled and understood it. The Placer County interrogation was conducted in a different location by different law enforcement officials, and Juarez lacked experience with the justice system. But considering the totality of the circumstances, we conclude that the Placer County interrogation was reasonably contemporaneous with the earlier advisement and waiver in Long Beach, and no *Miranda* readvisement was necessary at the outset of the Placer County interrogation. (Cf. *People v. Pearson* (2012) 53 Cal.4th 306, 317 [interview was reasonably contemporaneous with advisement and waivers that occurred 27 hours earlier].)

Juarez nevertheless contends that his statements made during the initial Long Beach interrogation and the subsequent Placer County interrogation should have been suppressed because he did not understand his rights. In support of his argument, he relies on his statements at the end of the Placer County interrogation indicating that he did not understand his rights. Those statements were made approximately 14 hours after the initial Long Beach interrogation, during which he told Agent Stevens that he understood his rights, he signed the advisement form, and he confessed to the murders. Juarez argues: "What are we to believe: a self-serving statement about the past [interrogation in Long Beach by Agent Stevens] that

was not recorded, or a videotaped statement of [Juarez during the interrogation in Placer County]?"

But the trial court found, after evaluating Agent Stevens's credibility, that in the Long Beach interrogation, "[Juarez] told Agent Stevens that he did understand his rights," "he signed the form," he "had no questions," and he "appeared to understand his rights" when he waived them in Long Beach. We accept the trial court's evaluations of credibility where, as here, substantial evidence supports them. In light of these credibility findings and the totality of the circumstances surrounding the interrogation in Long Beach, we have concluded that Juarez validly waived his rights before that interrogation. (See pt. IV.B.2.a., *ante*.)

As to the subsequent Placer County interrogation, Juarez indicated at the outset of that interrogation that he recalled and understood the advisement form he had signed in Long Beach. He then proceeded to confess again to the murders. It is true that at the end of the approximately two-hour interrogation, Sergeant McDonald asked Juarez to describe his rights, and Juarez said, "That I don't understand anything" and "I cannot understand what rights I can have." But Sergeant McDonald then followed up by asking Juarez to confirm that at the time he began the interrogation in Placer County, he understood he had the right to remain silent and the right to talk to an attorney stated on the form he had signed in Long Beach. For each right, Juarez did so confirm. Then, when Sergeant McDonald asked whether Juarez decided to talk to the officers because he wanted to do so and did not want to talk to an attorney, Juarez said, "What am I going to gain by talking to a lawyer?" Although this remark suggests that Juarez did not appreciate the value of speaking to an attorney, we conclude that this remark,

considered in its context, is insufficient to call into question the validity of his earlier waiver. The videotape of the interrogation shows that the brief remark was not a genuine question intended to elicit an explanation of the possible benefit of speaking to an attorney. The remark occurred in the course of Sergeant McDonald wrapping up the interrogation, and it is evident from Juarez's tone, body language, and lack of further questions that he was not seeking or expecting to receive information about what he could gain from talking to an attorney. Instead, the remark simply appeared to convey Juarez's perception that it would be futile to consult a lawyer in light of his predicament. Even if this perception was "unwise," as the trial court suggested, it fails to show that Juarez did not understand he had the right to speak with a lawyer.

Thus, considering Juarez's statements at the end of the Placer County interrogation in context, we do not find those statements to alter our conclusions that he validly waived his rights before the Long Beach interrogation and that no readvisement was required before the Placer County interrogation.

We additionally conclude that his confession was voluntary. In arguing to the contrary, Juarez emphasizes many of the same circumstances discussed above and adds that he was tired and weak after flying to Placer County. He asserts that he got little sleep and no food from his arrest around 8:40 p.m. on July 15 until his interrogation during the morning of July 16 in Placer County. But the record contains no indication that Juarez complained of hunger or weakness during the Placer County interrogation, or that any coercion rendered Juarez's statements involuntary.

### c. *Walk-through of the Parnell Ranch on July 17*

When Juarez moved to suppress his statements made during the walk-through as involuntary and obtained in violation of his rights, the trial court denied his motion. But the court subsequently excluded the videotape of the walk-through as unduly prejudicial. Because there was no possible prejudice at trial stemming from his walk-through at the ranch, we need not address this issue.

### 3. *Asserted Violation of the Vienna Convention*

Juarez further argues that the police did not advise him in a timely manner of his right to have his consulate notified of his arrest, in violation of Article 36 of the Vienna Convention and Penal Code section 834c. He argues that the trial court should have suppressed his statements, found the violation intentional, and considered it in the voluntariness inquiry.

When Juarez presented this claim in the trial court, the court concluded that he was not advised in a timely fashion of his right to have his consulate notified of his arrest under the Vienna Convention. (See Vienna Convention, *supra*, art. 36, par. 1(b), at p. 101 [requiring law enforcement officers to inform arrested foreign nationals, "without delay," that they have the right to have their consulate notified of their arrest].) The court found that the violation was negligent, not intentional, based on statements by law enforcement officers and the district attorney that they did not know of the Vienna Convention, despite opportunities to learn of it. The court further concluded that the violation was not of constitutional dimension. The court declined to suppress his statements or preclude the prosecutor from seeking the death penalty.

After Juarez's trial, "the United States Supreme Court [in *Sanchez-Llamas v. Oregon* (2006) 548 U.S. 331] made it clear that an officer's failure to notify a suspect of his or her consular rights does not, in itself, render a confession inadmissible." (*People v. Enraca* (2012) 53 Cal.4th 735, 756.) The California Legislature also enacted Penal Code section 834c, effective in 2000, to address Vienna Convention requirements. (Stats. 1999, ch. 268, § 1, pp. 2338–2341.) The statute requires the police, upon arresting or detaining a known or suspected foreign national "for more than two hours," to advise the foreign national of his or her consular rights but does not specify a remedy for violations. (§ 834c, subd. (a)(1).)

We find no violation of section 834c since that statute was not effective until after Juarez's arrest. But we proceed on the assumption that Juarez's consular rights were violated by law enforcement's failure to timely advise him of his right to have his consulate notified of his arrest under the Vienna Convention.

As the high court held in *Sanchez-Llamas*, such a violation does not, by itself, require suppression. "Article 36 [of the Vienna Convention] has nothing whatsoever to do with . . . interrogations. Indeed, Article 36 does not guarantee defendants *any* assistance at all. The provision secures only a right of foreign nationals to have their consulate *informed* of their arrest or detention — not to have their consulate intervene, or to have law enforcement authorities cease their investigation pending any such notice or intervention. In most circumstances, there is likely to be little connection between an Article 36 violation and evidence or statements obtained by police." (*Sanchez-Llamas v. Oregon*, *supra*, 548 U.S. at p. 349; accord, *People v. Vargas* (July 13, 2020, S101247) __ Cal.5th __

[2020 Cal. Lexis 4311, at pp. *65–67] [reversal not warranted "[d]espite the 'technical violation' of the Vienna Convention"].) However, " '[a] defendant can raise an Article 36 claim as part of a broader challenge to the voluntariness of his statements to police.' " (*People v. Enraca, supra*, 53 Cal.4th at p. 757, quoting *Sanchez-Llamas*, at p. 331; accord, *People v. Sanchez* (2019) 7 Cal.5th 14, 51.)

Juarez does so here. Contrary to his argument, however, the record supports the factual finding that the violation was not intentional. Agent Stevens, Detective Robbins, Sergeant McDonald, and Detective Bennett each testified to being unaware of the Vienna Convention at the time of Juarez's arrest. The district attorney also testified that he did not become aware of the advisement requirement under the Vienna Convention until around Juarez's arraignment, at which time Juarez was advised of his rights under the Vienna Convention. The trial court "accept[ed] the statements of the law enforcement officers" and "the district attorney" that they "did not know of the Vienna Convention," despite opportunities to learn of it. The trial court thus found that the violation of the Vienna Convention was negligent, not intentional. The trial court made that finding after assessing the credibility of numerous witnesses who testified about the circumstances surrounding the violation, and substantial evidence supports the finding.

In addition, Juarez argues that the trial court failed to consider the violation when evaluating the validity of his waiver and the voluntariness of his confessions. As noted, the trial court found no violation of Juarez's constitutional rights due to the Vienna Convention violation. The court then found "from the totality of the circumstances" that Juarez's statements were

"freely and voluntarily given after a sufficient advisement of his constitutional rights." Although the court did not expressly refer to the Vienna Convention violation in concluding that he validly waived his rights and voluntarily confessed, the court considered "the totality of the circumstances," and on this record, we decline to find error. In any event, we review independently whether Juarez validly waived his rights and voluntarily confessed. (See *People v. Rundle, supra*, 43 Cal.4th at p. 115.)

We find that Juarez has not established a relation between his lack of consular notice and his confessions. (See *People v. Leon, supra*, 8 Cal.5th at p. 846.) Juarez has not shown that had he been advised of his consular rights earlier, he would have requested that the consulate be notified. Even after he was advised of his rights at his arraignment, he did not request such notification. It is true that defense counsel said she had "had numerous contacts" with the consulate on his behalf. And he submitted a declaration — which the trial court deemed not competent evidence in the absence of cross-examination — stating, among other things, "Had I known I could talk to someone from the Mexican Consulate, before speaking with the officers, I would have done so." But his statement was largely "unpersuasive in view of the other evidence, because it was 'conclusory, self-serving, and not subject to cross-examination.'" (*U.S. v. Amano* (9th Cir. 2000) 229 F.3d 801, 805.) As the trial court found, Juarez "readily appeared willing to talk to the police and to fully explain the circumstances of the crime." We conclude that in the totality of the circumstances, the failure to timely advise him of his consular rights did not overcome his will and render his waiver invalid or his confessions involuntary. There was no error in admitting his confessions.

## C. CALJIC No. 2.28

The Placer County District Attorney's Office retained Dr. Frank Dougherty, a forensic psychologist, to observe the July 16, 1998 interrogation live by means of a closed circuit television transmission. Dr. Dougherty "discussed various aspects of possible mental health defenses and issues regarding [Juarez] . . . and consulted with Deputy District Attorney Thomas Beattie and various sheriff's deputies regarding interview techniques and anticipated prosecutorial issues related to [Juarez's] actual or potentially alleged mental health." Dr. Dougherty believed he took "some contemporaneous notes," but he was unable to locate any notes after a "diligent" search. He did not provide any consultation on this case after July 16. The defense learned of his existence in October 2000, contacted him in December 2000, and interviewed him. The prosecutor subsequently represented that Dr. Dougherty said, "It doesn't look like there's anything wrong with him," but the prosecutor was not aware of any notes taken by Dr. Dougherty.

The defense asked the trial court to instruct the jury pursuant to CALJIC No. 2.28, which explained the rules of discovery and permitted the jury to consider failures to timely disclose evidence. The court denied the request. The court reasoned that "it's not clear that this witness had notes, although he may have." Even if he did, "it would be entirely speculative to assume that those notes would include anything that would aid the jury because those notes would only be about things that the jury can view through the videotape anyway, and thus any conjecture that this jury might enter into as to how a psychologist watching the interview or anybody else watching the interview would give additional useful information would be just that: conjecture." Juarez contends that the trial court

erred, depriving him of due process and a fair, reliable, and impartial determination of his guilt and sentence.

Section 1054.1 requires the prosecutor to disclose to the defendant, among other things, the names, addresses, and "[r]elevant written or recorded statements of witnesses," and "reports of the statements of witnesses whom the prosecution intends to call at trial, including any reports or statements of experts made in conjunction with the case." (*Id.*, subds. (a), (f).) When a party fails to comply with its discovery obligations, the trial court may, among other things, "advise the jury of any failure or refusal to disclose and of any untimely disclosure." (*Id.*, subd. (b).) Here, it was not clear that the prosecutor failed to comply with discovery obligations. The prosecutor never intended to call and did not call Dr. Dougherty as a witness. Although Dr. Dougherty "may have" taken notes, the trial court observed, "it's not clear" that he did. Under these circumstances, the prosecutor's asserted failure to comply with discovery obligations and the trial court's refusal to instruct the jury as requested did not deprive Juarez of due process or a fair, reliable, and impartial determination of his guilt and sentence. The July 16 interrogation was videotaped and played for the jury, and as the trial court reasoned, it is mere "conjecture" that any notes taken by Dr. Dougherty would have provided "additional useful information" to aid the jury's own viewing of the videotaped interrogation.

### D. Sufficiency of Evidence for Felony Murders of José and Juan

The jury was instructed that it could convict Juarez of the first degree murders of José and Juan based on the theories of premeditation and deliberation, lying in wait, or felony murder. The jury found him guilty of the first degree murders.

Juarez claims that there was insufficient evidence of felony murder, i.e., that he killed José and Juan during the commission of a robbery. Juarez argues that the trial court erred in instructing the jury as to that theory and in declining to provide a requested instruction concerning "independent felonious intent." He emphasizes that when he moved pursuant to section 1118.1 for the entry of a judgment of acquittal on the felony-murder special circumstances regarding José and Juan, the court granted his motion. In considering his section 1118.1 motion, the court indicated that it might grant the motion because "what was going on here was a robbery in the course of a murder, not a murder in the course of a robbery," and "there is such a solid basis in the evidence for the multiple murder and lying in wait special circumstances, that it is a neater, cleaner, more understandable way to present to the jury the only issues that are really going to make much difference anyway." The prosecutor did not object to the motion, and the court granted it.

Preliminarily, we reject Juarez's contention that the trial court erred in declining to provide a requested instruction concerning "independent felonious intent." After the prosecutor argued against giving the instruction, the court questioned defense counsel about it, asking whether a killing that occurred during the commission of a robbery could support a felony murder conviction even if the robbery was committed for purposes of concealing the killing. Defense counsel essentially withdrew the request by responding, "I have to concede at this point in time that Mr. — the prosecution is correct, and I was thinking of something else, and unfortunately, the case law does not support my thought process." The court then denied the request.

Even assuming the issue was preserved for review, we find no error. The jury was instructed that for felony murder, the unlawful killing must occur during the commission or attempted commission or as a direct causal result of the crime of robbery and the perpetrator must have had the specific intent to commit that crime. The jury was also instructed that for the crime of robbery, "the perpetrator must have formed the specific intent to permanently deprive an owner of his property before or at the time that the act of taking the property occurred" and "before or at the time of the application of force or violence, or the use of fear or intimidation." Thus, "[w]ith the robbery and felony-murder instructions given, the jury was adequately instructed that [Juarez] must have possessed the intent to commit robbery at the time of the killing to be guilty of felony murder . . . ." (*People v. Mora and Rangel* (2018) 5 Cal.5th 442, 499.)

As to his remaining contentions, "[w]hether we review [the] claim as asserted instructional error in [instructing the jury on a particular theory of first degree murder for which there was insufficient evidence] or insufficiency of the evidence supporting the jury's verdict, we apply essentially the same standard. [Citation.] We 'review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence — that is, evidence which is reasonable, credible, and of solid value — such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Nelson* (2016) 1 Cal.5th 513, 550.)

"Robbery is defined as 'the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear.' (§ 211.) Robbery requires the 'specific intent to permanently deprive' the victim of his or her property."

(*People v. Mora and Rangel, supra,* 5 Cal.5th at p. 489.) "Liability for first degree murder based on a felony-murder theory is proper when the defendant kills in the commission of robbery, burglary, or any of the other felonies listed in section 189. . . . [T]o find a defendant guilty of first degree murder based on a killing perpetrated during a robbery, the evidence must show the defendant intended to steal the victim's property either before or during the fatal assault." (*People v. Lewis* (2001) 25 Cal.4th 610, 642.) " ' "[T]he killing need not occur in the midst of the commission of the felony, so long as that felony is not merely incidental to, or an afterthought to, the killing.' [Citation.] In addition, a homicide occurs in the perpetration of an enumerated felony for the purpose of the felony-murder rule if both offenses were parts of ' "one continuous transaction." ' [Citation.] ' "There is no requirement of a strict 'causal' [citation] or 'temporal' [citation] relationship between the 'felony' and the 'murder.' " ' [Citation.] In addition, '[c]ircumstantial evidence may provide sufficient support for a felony-murder conviction.' " (*People v. Prince* (2007) 40 Cal.4th 1179, 1259.)

Here, there was evidence that when José and Juan arrived at the Parnell Ranch, José wore a watch, Juan wore gold chains, and both carried wallets. After their arrival, Juarez asked José to accompany him into the field, which he did. Y.M. did not see Juan. When Y.M. subsequently asked where José and Juan were, Juarez said that they were cleaning and cutting a deer that he had killed. Although there were no eyewitnesses to the murders, the evidence indicated that during this time, Juarez shot José and Juan and buried them. The following day, law enforcement officers discovered boots under the bed in Juarez's trailer, and inside them were three metal chains, a watch, and

two wallets containing identification for José and Juan, $147 in American currency, and $80 in Mexican pesos. These items did not have dirt on them, which suggested that the items were removed before placing the men in the grave. In addition, the clasps on the chains appeared undamaged; the jury may have reasonably inferred from this fact that Juarez sought to preserve the value of these items as opposed to hastily taking them as an afterthought to the murders. Rather than destroying the items, Juarez also placed them within his boots under his bed.

It is true that there was evidence showing that Juarez had planned to kill José and Juan, and when asked in the interrogation why Juarez took their jewelry and wallets, Juarez said that "[w]hen [he] saw those things it occurred to [him] to take it" and that he took the items because they would be able to identify José and Juan, not because they were valuable. Viewing all of the evidence in the light most favorable to the judgment, however, we find that a reasonable trier of fact could conclude that Juarez had a concurrent intent to rob and kill José and Juan and that the robberies were not merely incidental to, or an afterthought to, the murders. (Cf. *People v. Brooks* (2017) 3 Cal.5th 1, 65 ["And although defendant may have intended to commit arson for the *additional* purpose of concealing [the victim's] identity and his role in her killing, we have observed that concurrent intent to kill and to commit the target felony does not preclude a felony-murder theory of first degree murder."].) The record discloses legally sufficient evidence of Juarez's guilt of felony murder based on robbery. We further conclude that even though the trial court granted the section 1118.1 motion as to the felony-murder special circumstances, the felony murder theory of guilt was still

properly before the jury, and the trial court did not err in instructing the jury on that theory.

Even assuming that there was insufficient evidence to support the felony murder theory of guilt and that the trial court erred in instructing the jury on that theory, we would still uphold the first degree murder verdicts here. "A first degree murder verdict will be upheld if there is sufficient evidence as to at least one of the theories on which the jury is instructed, 'absent an affirmative indication in the record that the verdict actually did rest on the inadequate ground.'" (*People v. Nelson*, *supra*, 1 Cal.5th at p. 552 [upholding first degree murder verdict where there was sufficient evidence of the primary prosecution theory of first degree murder based on premeditation and deliberation, even though there was insufficient evidence to support the theory of first degree murder based on lying in wait].) Juarez does not challenge the sufficiency of evidence for the lying-in-wait and premeditation and deliberation theories on which the jury was instructed. The record contains ample evidence in support of these theories: Among other things, he dug the hole in advance of their arrival, he walked José and Juan toward the hole after telling them that he had shot a deer and needed them to go to it, and he shot them in the head from less than an inch away. The jury found true the special circumstance that he killed them while lying in wait, which in itself makes the killing first degree murder. Accordingly, we uphold the first degree murder verdicts for the murders of José and Juan.

### E. Constitutionality of Lying-in-wait Special Circumstance

Juarez claims that the lying-in-wait special circumstance is unconstitutional because it is vague and fails to adequately

narrow the class of persons eligible for the death penalty.  We have previously rejected these claims.  (See, e.g., *People v. Cage* (2015)   62 Cal.4th 256,   281;   *People   v.   Lewis*   (2008) 43 Cal.4th 415,  516.)    He also challenges  the  lying-in-wait special-circumstance  instruction,  CALJIC  No.  8.81.15,  as confusing and contradictory.  We have previously rejected these challenges.  (See, e.g., *People v. Cage*, at pp. 280–281; *People v. Bonilla* (2007)  41 Cal.4th 313, 332–333.)   Juarez provides no reason to revisit those decisions here.

## F. Sufficiency of Evidence for Lying-in-wait Special Circumstance as to J.M. and A.M.

Juarez contends  that  there  was  insufficient  evidence  to support  the jury's finding that he killed J.M. and A.M. while lying in wait.

"A   sufficiency   of   evidence   challenge   to   a   special circumstance  finding  is  reviewed  under  the  same  test  applied  to a conviction.  [Citation.]  Reviewed in the light most favorable to the record must contain  reasonable  and  credible evidence of solid value, 'such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Stevens* (2007) 41 Cal.4th 182, 201.)

At the time of the 1998 murders, " 'the  elements of  the lying-in-wait  special  circumstance  required  an  intentional killing, committed under circumstances that included a physical concealment  or  concealment  of  purpose;  a  substantial  period  of watching  and  waiting  for  an  opportune  time  to  act;  and, immediately  thereafter,  a  surprise  attack  on  an  unsuspecting victim  from  a  position  of  advantage.   [Citations.] . . . .   [The period  of  waiting  and  watching]  need  not  continue  for  any particular length " 'of time provided that its duration is such as

to show a state of mind equivalent to premeditation and deliberation.' " [Citation.] " ' "The element of concealment is satisfied by a showing ' "that a defendant's true intent and purpose were concealed by his actions or conduct. It is not required that he be literally concealed from view before he attacks the victim." ' " ' " [Citation.] The factors of concealing murderous intent, and striking them from a position of advantage and surprise, "are the hallmark of a murder by lying in wait." [Citation.]' [Citations.] '[T]he lying-in-wait special circumstance requires "that the killing take place *during the period of concealment and watchful waiting. . . .*" [Citation.]' [Citation.] ' "During" means "at some point in the course of." ' [Citation.] [¶] Moreover, when the capital crime[s] occurred, the lying-in-wait special circumstance required a showing that the defendant 'intentionally killed the victim *while* lying in wait.' (§ 190.2, former subd. (a)(15), italics added.)" (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1183–1184.)

Viewing the evidence in the light most favorable to the judgment, we conclude that a rational trier of fact could have found true this special circumstance. The record contains evidence that Juarez walked J.M. and A.M. approximately a quarter-mile to a remote location, where he had dug a hole that already contained the bodies of José and Juan and that was deep enough to hold additional bodies. "[T]he jury could reasonably infer that a matter of minutes elapsed" on the walk. (*People v. Edwards* (1991) 54 Cal.3d 787, 826 [substantial period of watching and waiting where "more than a quarter of a mile separated the spot where defendant first saw the girls and where he shot them"].) The jury could also reasonably conclude that he concealed his purpose as they walked. It is true that the children had seen him attack their mother, they had cried, and

he had put tape on them. But Juarez said that he removed the tape and that the children wanted to see their father. The jury could reasonably infer that despite having been upset, the children — aged three and five — were willing to walk with Juarez because he was an adult with whom they were familiar. Juarez himself said that the children had calmed down and that A.M. became tired, so he let go of J.M.'s hand and carried her. Finally, the record contains evidence that once near the hole, he struck the children's heads and put them in the hole. This is sufficient to infer a substantial period of watching and waiting, followed by a surprise attack from a position of advantage.

### G. Sufficiency of Evidence for Felony Murders of J.M. and A.M.

The jury was instructed that it could convict Juarez of the first degree murders of J.M. and A.M. based on the theories of premeditation and deliberation, lying in wait, or felony murder. The jury found him guilty. Juarez claims, however, that there was insufficient evidence of felony murder — that is, that he killed them in the commission of the rape or penetration by a foreign object of Y.M. — and the trial court erred in instructing the jury as to that theory. He acknowledges that the felony-murder special circumstances as to J.M. and A.M. were dismissed.

We need not decide whether sufficient evidence supported the theory of felony murder here. The jury's true findings regarding the lying-in-wait special circumstance show that the jury found that Juarez killed J.M. and A.M. while lying in wait. Because there was sufficient evidence to support the first degree murder verdicts based on the lying-in-wait theory (see pt. IV(F), *ante*) and no indication that the verdicts rested on the felony murder theory, the verdicts must be upheld.

## H. Admission of Photographs

The prosecutor sought to introduce 14 crime scene and 25 autopsy photographs depicting the four murder victims. The defense objected to all but three of them. The trial court considered each photograph and excluded eight as cumulative or unduly prejudicial, directed the prosecutor to crop one, and allowed the remaining to be introduced.

During the guilt phase, Detective Summers testified about the excavation of the grave and photographs depicting the victims within it. The photographs were displayed on a screen, and at times, the prosecutor enlarged parts of them. When the defense objected to these enlargements, the trial court directed the prosecutor to inform the defense before enlarging anything on the screen, but noted that the overhead projections were of "significantly lower quality than the actual photographs" and "there has been nothing more than a restoration on the screen" of the actual photographs. Dr. Henrikson also testified during the guilt phase about the autopsies and photographs from them.

Juarez contends that the trial court abused its discretion and violated his federal constitutional rights to a fair trial, due process, and reliable verdicts and sentence.

" ' "This court is often asked to rule on the propriety of the admission of allegedly gruesome photographs. [Citations.] At base, the applicable rule is simply one of relevance, and the trial court has broad discretion in determining such relevance." ' " (*People v. Powell* (2018) 6 Cal.5th 136, 163.) " ' "A trial court's decision to admit photographs . . . will be upheld on appeal unless the prejudicial effect . . . clearly outweighs their probative value." ' " (*Ibid.*)

Here, the trial court exercised its discretion in excluding some photographs and admitting others. We have examined the photographs. The crime scene photographs were relevant to show that the murders occurred, where and how the victims were buried, and the order in which they were buried. (See *People v. Cowan* (2010) 50 Cal.4th 401, 475 [photographs showed "the locations and positions in which [the] bodies were found"].) The autopsy photographs were relevant to show the manner of the killings and to clarify testimony regarding the victims' injuries and causes of death. (*Ibid*.) Although the photographs were numerous, "none gratuitously duplicated any other." (*People v. Memro* (1995) 11 Cal.4th 786, 867; see *People v. Panah, supra,* 35 Cal.4th at pp. 476–477 [no abuse of discretion for admitting eight photographs of victim]; *People v. Crittenden* (1994) 9 Cal.4th 83, 131–135 [no abuse of discretion for admitting 24 photographs of two victims].)

Nor were the photographs " 'so gruesome as to have impermissibly swayed the jury.' " (*People v. Burney* (2009) 47 Cal.4th 203, 243.) The excavators proceeded carefully in an effort to preserve and photograph the original positions of the bodies. Similarly, the autopsy photographs did not contain gratuitous details. Contrary to Juarez's argument, they were wholly unlike the autopsy photographs in *People v. Marsh* (1985) 175 Cal.App.3d 987, 996–999, which were "gruesome solely because of the autopsy surgeon's handiwork; removing the skull, opening the body cavity, covering the child's face with the exposed underside of the bloody scalp, etc." We conclude the trial court did not abuse its discretion or violate Juarez's constitutional rights.

## I. Prosecutorial Misconduct

Juarez contends that the prosecutor committed misconduct by eliciting inadmissible and prejudicial testimony. This misconduct, he contends, violated his rights to due process and a reliable guilt and penalty determination.

### 1. *Testimony by Deputy Walker*

While discussing motions in limine, defense counsel noted that a responding officer had described "[Y.M.] running her finger across her neck in a gesture," but defense counsel did not believe that the prosecutor intended to introduce this evidence. The court said, "Well, let's — why don't we deal with this whenever you think it first needs to come up." The prosecutor said, "That's fine, Your Honor."

During the guilt phase, Deputy Walker testified about talking to Y.M. on the night of the crimes. He asked her whether she had been tied up. When the prosecutor asked about her response, the defense objected on hearsay grounds, but the court overruled the objection. Deputy Walker testified, "I don't remember if I got a response in regards to the duct tape, but I do remember regards [*sic*] to the scarf that was around her neck." The prosecutor asked, "Did she physically manipulate or move the scarf in some fashion in response to your question?" to which Deputy Walker replied affirmatively. The prosecutor then asked, "How did she do that?" Deputy Walker replied, "She took the scarf, put it in her mouth and said, 'Arturo bad,' " and Deputy Walker made a "grating noise" and "dr[ew] his right index finger across his neck."

The defense objected and, outside the presence of the jury, moved for a mistrial, arguing that the gesture and noise were hearsay, prejudicial, and conveyed that Y.M. wanted Juarez to

be killed. Although opposing this, the prosecutor described the gesture as Y.M. "expressing anger regarding [Juarez] and perhaps a desire to get even for what has occurred."

The trial court urged counsel to remember "those matters with respect to which there are in limine orders in place and which have not been ruled on," and observed that defense counsel "did what he needed to do in order to assure that he could get a ruling on this evidence before the jury heard it." The court, however, denied the motion for a mistrial. The court concluded that the gesture fell within the hearsay exception for excited utterances and carried "little, if any," prejudice. The court explained that the gesture was "highly ambiguous." "[I]t is extraordinarily unlikely that what [Y.M.] was trying to convey was [Juarez] has done a terrible thing and should receive the death penalty." Instead, "it is highly likely what she was trying to convey is yes, I had some kind of a binding of some sort around my neck," or at most, "an expression of undifferentiated outrage." The court also denied the defense's request to admonish the jury to disregard Deputy Walker's testimony, without prejudice to the defense later requesting an instruction that the jury should disregard any victim's views on how this case should be resolved.

" ' "A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct 'so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process.' " ' [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves ' " 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' " ' " (*People v. Samayoa* (1997) 15 Cal.4th 795, 841.) " ' "It is, of

course, misconduct for a prosecutor to 'intentionally elicit inadmissible testimony.' [Citations.]" [Citation.] Such misconduct is exacerbated if the prosecutor continues to elicit such evidence after defense counsel has objected.' [Citation.] However, a prosecutor cannot be faulted for a witness's nonresponsive answer that the prosecutor neither solicited nor could have anticipated." (*Tully, supra,* 54 Cal.4th at p. 1035; *People v. O'Malley* (2016) 62 Cal.4th 944, 998.)

Whether the prosecutor, in asking Deputy Walker how Y.M. physically manipulated or moved the scarf, could have anticipated the testimony about her gesture and noise presents a close issue. The prosecutor did not directly ask whether she made a gesture or a noise, although defense counsel had alerted the prosecutor to the issue and the trial court had expressly reserved the issue. But even assuming the prosecutor elicited this testimony in violation of the court's request to rule on it, the prosecutor's "asking of a single question" did not constitute a "pattern of conduct so egregious that it rendered the trial fundamentally unfair." (*People v. Cox* (2003) 30 Cal.4th 916, 952.) Nor did the prosecutor's conduct cause prejudice at the guilt phase or the penalty phase of the trial. The gesture and noise were a brief and passing element of a lengthy trial, with little if any prejudicial weight in comparison to the totality of other evidence. We find no prejudicial misconduct or trial court error.

### 2. *Testimony by Orozco*

The trial court ordered that "no other crimes evidence, no character evidence, and no reputation evidence be introduced during the guilt phase," without a court order. Before Orozco

testified, the prosecutor stated that he no longer intended to introduce testimony about Juarez's womanizing.

During Orozco's testimony, the prosecutor asked whether he recalled "anything [Juarez and he] talked about on the way back" after visiting the Martinezes. Orozco replied affirmatively. The prosecutor asked, "And what was that?" Orozco responded in Spanish, but the interpreter did not translate his response in the jury's presence. Outside the jury's presence, the interpreter translated his response: " 'He was talking to me about being with a girl in Santa Gertrudis.' "

The defense moved for a mistrial, arguing that the prosecutor violated his representation regarding Orozco's testimony. The court denied the motion but agreed to strike Orozco's response and instruct the jurors that to the extent they understood it, they should disregard it.

Shortly after resuming, the prosecutor asked Orozco whether Juarez said anything about the Martinezes on the drive. Orozco responded no, and further testified that Juarez did not mention being threatened by José or Juan.

There was no misconduct. Although the prosecutor asked an open-ended question, it is not clear that the prosecutor solicited or anticipated Orozco's response. And even if we assume that the prosecutor did anticipate Orozco's response, it did not render the trial fundamentally unfair or cause prejudice. The response was brief and stated in Spanish, and the court struck it and instructed the jury to disregard it.

## V. PENALTY PHASE ISSUES

## A. Denial of Discovery Motion Regarding Discriminatory Prosecution

Juarez contends that the trial court erred in denying his motion for discovery to pursue a claim of discriminatory prosecution by the Placer County District Attorney's Office (District Attorney). He asks us to remand the case to the trial court to consider his claim of discriminatory prosecution after he receives discovery.

" '[D]iscriminatory enforcement of the laws may be a valid defense in a case in which the [defense] can establish deliberate invidious discrimination by prosecutorial authorities.' [Citation.]. . . . In *Murgia*[ *v. Municipal Court* (1975)] 15 Cal.3d [286, 306], we held that when a defendant seeks to defend a criminal prosecution based on discriminatory prosecution, 'traditional principles of criminal discovery mandate that defendants be permitted to discover information relevant to such a claim.' " (*People v. Montes* (2014) 58 Cal.4th 809, 828.) "Under our state law standard, a *Murgia* motion must ' "describe the requested information with at least some degree of specificity and must be sustained by plausible justification." ' [Citation.] We have held a showing of 'plausible justification' requires a defendant to 'show by direct or circumstantial evidence that prosecutorial discretion was exercised with *intentional and invidious discrimination in his case.*' [Citation.] Similarly, under the federal standard, a defendant must produce ' "some evidence" ' tending to show the existence of both a discriminatory effect and the prosecutor's discriminatory intent." (*Id.* at p. 829.) On appeal, we assume that the motion was validly made and consider "whether

79

defendant made the requisite showing under state or federal standards to obtain the discovery he sought." (*Ibid*.)

Juarez argues that he made the requisite showing based on two facts alleged in his motion. First, since 1977, there were only three other cases involving multiple murders and murders of children; the defendants (James Hill, Kenneth McGraw, Theresa Knorr) were Caucasian and were offered plea bargains. Second, in the preceding decade, the District Attorney sought the death penalty at trial against only two defendants, both of whom were African American.

The Attorney General argues that Juarez failed to make the requisite showing and relies on additional facts identified by the District Attorney. First, the cases against Hill, McGraw, and Knorr were distinguishable. Hill had been admitted to a mental hospital before killing his two children; McGraw had been found incompetent to stand trial for killing his pregnant estranged wife and daughter, and a key prosecution witness had died before McGraw's criminal proceedings resumed; and Knorr's case had been transferred to another county, where the District Attorney did not participate. Second, Juarez's date range for death penalty trials was arbitrary and misleading. Based on the prosecutor's "personal knowledge of the cases, [his] personal review of court files, and on [his] direct communication with [deputy district attorneys]," the District Attorney charged 46 defendants (of whom 26 were White, 19 were persons of color, and one was of unknown ethnicity) with special circumstances between 1977 and 2000, and sought the death penalty at trial against eight of them, of whom five were White, two were African American, and one was of unknown ethnicity.

The trial court denied the motion after finding no showing of discriminatory effect or discriminatory intent based on a case-by-case analysis or a statistical analysis. The court noted that no case in the county's history involved the "degree of criminal conduct in terms of multiple homicides and sexual assault" as existed here.

We see no error. Juarez's case-by-case analysis boils down to merely two cases, both of which involved fewer murders and no rape allegations. Neither comparison is persuasive. In addition, his statistics about the District Attorney seeking the death penalty at trial "failed to take into account the case characteristics of the homicides" and used an arbitrary date range, as suggested by the District Attorney's additional information in this regard. (*People v. Montes*, *supra*, 58 Cal.4th at pp. 830–831.) Juarez has not made the requisite showing.

**B. Use of Jail Visitation Logs**

Before trial, the prosecutor's investigator reviewed Juarez's jail visitation logs and contacted persons listed on them. Juarez contends that this conduct violated his statutory and constitutional rights and urges us to set aside his convictions and sentence.

*1. Background*

In December 1999, defense counsel learned that the prosecutor's investigator, Joe Bertoni, had contacted two of its experts. The defense filed an emergency application to restrain the prosecutor from accessing the identities of defense experts or contacting them, and to order the prosecutor to disclose all defense experts of whom they had become aware or whom they had contacted and the source of that information. At a December 13, 1999 hearing, the defense explained that the

prosecutor had obtained the information from jail visitation logs. The trial court ordered the prosecutor to provide the defense with copies of the jail visitation logs, a list of all persons contacted from them, and a summary of all information obtained. The court also ordered the prosecutor not to review the logs or contact persons on them and not to disclose information obtained to the Attorney General, pending a further hearing. The defense subsequently moved to estop the prosecutor from seeking the death penalty, to recuse the District Attorney, and to require the prosecutor to demonstrate that no part of its case relied on information thus obtained.

At the hearing in January 2000, the acting corrections support supervisor, Donna Sylvia, testified that the jail maintains visitation logs for security reasons but routinely provides them to law enforcement. The logs contain the date and time of each visit, classify the visit as either personal or professional, and contain a remarks field that typically lists the visitor's name, contact information, and relationship (if personal) or occupation (if professional). The logs typically do not contain the purpose of the visits, although a clerk could enter that information in the remarks field. For example, the log refers once to "psych eval" in the remarks field.

Bertoni testified that he routinely reviewed visitation logs in his investigations to identify potential witnesses and was not aware of any rule prohibiting such review. He accessed the logs in Juarez's case through his network terminal on two occasions (once in 1998 and again around July 1999), and due to a system change, he requested and received them through the jail records custodian on a third occasion (around Sept. or Oct. 1999). On that third occasion, he requested them after being asked to do so in a memorandum by Deputy District Attorney Peggy Turner,

who indicated she acted on behalf of Deputy District Attorney Thomas Beattie. The memorandum asked Bertoni to review the logs and gather information about professionals listed in them, including whether, where, and what they had previously testified.

Bertoni testified that in reviewing the logs, he identified personal visitors who might lead to additional interviews and sought information about professional visitors. He contacted four of the personal visitors as part of his "continuing investigation." He searched the Internet and contacted associations in regard to two professional visitors; from this, he learned that one of the professionals had testified in Sonoma County. He then called the two professionals, identified himself, said that they might be witnesses in this case, and asked for their curricula vitae and experience testifying. One of the professionals agreed to provide her curriculum vitae and said that she had testified approximately "40/60" for the prosecution and the defense but did not clarify to which side the percentages corresponded. Bertoni testified that he did not recall but may have referred to the other professional by name in his call with her. Bertoni did not ask about their conversations with Juarez, and no confidential communications were divulged. He provided the information he collected to Turner and Beattie.

Following the hearing, the trial court concluded that the prosecutor did not violate any express statutory provision, but the court made note of section 987.9, which authorizes a capital defendant to "request the court for funds for the specific payment of investigators, experts, and others for the preparation or presentation of the defense," and provides that "[t]he fact that an application has been made shall be confidential and the contents of the application shall be

confidential." In order to facilitate section 987.9's purpose and spirit, and to permit the defense to prepare its case in an atmosphere of confidentiality, the court ordered the jail not to disclose, and the District Attorney not to obtain, any information pertaining to the defense expert witnesses in the case unless an exception applied. "Expert witnesses" for purposes of this order meant persons retained by the defense pursuant to section 987.9. The court declined to preclude the prosecutor from seeking the death penalty or to recuse the District Attorney because the court found the defense had failed to establish the necessity of either sanction. The court found no showing of material prejudice. The court declined to speculate that the prosecutor held the key to the defense's case based on the names of two potential experts. The court reasoned that the information about the two experts would have been subsequently disclosed to the prosecutor or would have been rendered irrelevant. The court noted that "[t]here may well be other tactical arguments or information that might be gleaned from the presence or absence of any particular witness," but in the very early stage of the trial preparation process here, the court was "only given the possibility of prejudice without any actual showing of prejudice."

Several months later, the defense renewed its motion to estop the prosecutor from seeking the death penalty and to recuse the District Attorney. The defense claimed that the prosecutor improperly contacted the California Medical Forensic Group (CMFG), which provided medical and mental health care to inmates, and learned that Juarez's file did not contain any psychotherapist records. The defense argued that the prosecutor sought this information to determine whether there was any medical or mental condition that might bear on

the *Miranda* issues or on the mitigating evidence at the penalty phase. The prosecutor responded that he had contacted CMFG because he had issued a subpoena and did not want to inadvertently receive materials subject to the psychotherapist privilege. The trial court denied the motion. The court characterized the prosecutor's conduct as "probably ill advised" and "probably improper" but "an honest attempt to avoid problems of getting information they didn't have a right to." The court subsequently ruled that the prosecution could not introduce Juarez's jail medical records in its case-in-chief.

## 2. *Discussion*

Juarez seems to agree with the Attorney General that a prosecutor can access jail visitation logs for purposes other than gathering information about a defendant's possible defenses. (Cf. *People v. Loyd* (2002) 27 Cal.4th 997, 1010 ["California law now permits law enforcement officers to monitor and record unprivileged communications between inmates and their visitors to gather evidence of crime"].) He focuses his claim on the prosecutor's use of the jail visitation logs to obtain information about defense experts. He contends that this conduct violated state statutes and his constitutional right to counsel, his right against self-incrimination, and his rights to due process and equal protection. He also asserts with little analysis that this conduct violated Evidence Code section 1017 and his rights to be free of unreasonable searches and seizures and to privacy and association.

We begin with Juarez's statutory claims. Civil Code section 1798.24 of the Information Practices Act of 1977 (Civ. Code, § 1798 et seq.) prohibits agencies from disclosing "personal information in a manner that would link the

85

information disclosed to the individual to whom it pertains," absent an exception. Subdivision (e), however, permits disclosing information to another agency when the disclosure is necessary for the agency to perform its duties and "the use is compatible with a purpose for which the information was collected." (Civ. Code, § 1798.24, subd. (e).) When information is transferred to or from a law enforcement agency, "a use is compatible if the use of the information requested is needed in an investigation of unlawful activity under the jurisdiction of the requesting agency." (*Ibid.*) Subdivision (o) additionally permits disclosing information "[t]o a law enforcement or regulatory agency when required for an investigation of unlawful activity" unless the disclosure is otherwise prohibited by law. (Civ. Code, § 1798.24, subd. (o).) Information that is permitted to be disclosed under subdivision (e) or subdivision (o) "shall be provided when requested by a district attorney." (Civ. Code, § 1798.68.) Because the Information Practices Act of 1977 provides that information required for an investigation of unlawful activity "shall be provided" to a district attorney upon request, we do not find a violation of this statute by the prosecutor's access to the jail visitation logs here.

Section 987.9 provides that in a capital case trial, "the indigent defendant, through the defendant's counsel, may request the court for funds for the specific payment of investigators, experts, and others for the preparation or presentation of the defense." (§ 987.9, subd. (a).) "The fact that an application has been made shall be confidential and the contents of the application shall be confidential." (*Ibid.*) In light of section 987.9's directive that not only the contents of a defense application for payment of experts but also the mere "fact that an application has been made" "shall be confidential," we find it

troubling that the prosecutor in this case directed the investigator to review the visitation logs for the purpose of learning about the defense's possible experts. Through these efforts, the prosecutor learned about two experts who were consulted but who ultimately did not testify. In other words, the prosecutor's purpose was to learn — and he in fact did learn — what he could about the defense plans from whatever could be gleaned from the identities of the defense's possible experts. Although section 987.9 does not expressly make confidential the fact that a defense expert visited a defendant in jail, the prosecutor's conduct is difficult to square with the evident purpose of section 987.9. (See *People v. Berryman* (1993) 6 Cal.4th 1048, 1071 [" 'The confidentiality requirement was evidently intended to prevent the prosecution from learning of the application for funds *and thereby improperly anticipating the accused's defense.*' " (italics added)].)

However, even if we find the prosecutor's learning about the defense's possible experts to be an improper invasion of Juarez's statutory entitlement to confidentiality in consulting defense experts, we cannot reverse the judgment unless we find it "reasonably probable that a result more favorable to [the defendant] would have been reached" at the guilt phase in the absence of the prosecutor's conduct (*People v. Watson* (1956) 46 Cal.2d 818, 836) or that there is "a reasonable (i.e., realistic) possibility that the jury would have rendered a different verdict" at the penalty phase in the absence of the prosecutor's conduct (*People v. Brown* (1988) 46 Cal.3d 432, 448). Here, neither the prosecutor nor the investigator sought to learn, or actually learned, of any conversations among Juarez, the experts, and defense counsel. The circumstances here differ from those in *Morrow v. Superior Court* (1994) 30 Cal.App.4th 1252, 1261,

where the prosecutor "orchestrate[d] an eavesdropping upon a privileged attorney-client communication in the courtroom and acquire[d] confidential information." (*Ibid.* [dismissal is appropriate because there was a " 'substantial threat of demonstrable prejudice' " as a matter of law].)

Further, the record does not show that the conduct aided the prosecution or harmed the defense. The trial court, alert to the confidentiality guarantee in section 987.9, restricted the prosecution's access to information about defense experts in December 1999, approximately 15 months before trial. There is no showing of specific insights that the prosecutor divined about defense strategy before then. And neither the Attorney General nor Juarez identify any specific evidence offered by the prosecution that was developed as a result of the visitation logs. Nor has Juarez pointed to any specific evidence that the defense chose not to present as a result of the prosecutor's conduct. Juarez also has not shown that the prosecutor's conduct actually impaired Juarez's ability to consult with counsel or any expert, or his ability to otherwise assist in his defense. We conclude that, despite the impropriety of the prosecutor's conduct, reversal on statutory grounds is unwarranted.

We further reject Juarez's related assertion that the attorney-client and work-product privileges were violated. None of the information obtained from the visitation logs constituted "a confidential communication between client and lawyer." (Evid. Code, §§ 952, 954.) Nor did the information constitute attorney work-product material — that is, " ' "any *writing* reflecting 'an attorney's impressions, conclusions, opinions, or legal research or theories.' " ' " (*People v. Zamudio* (2008) 43 Cal.4th 327, 355; see *id.* at p. 355, fn. 14.)

We next consider whether the prosecutor's conduct violated Juarez's right to counsel under article I, section 15 of the California Constitution. In *Barber v. Municipal Court* (1979) 24 Cal.3d 742, 745 (*Barber*), we considered the proper remedy when an accused's constitutional right to counsel has been denied by the actions of an undercover police officer who posed as a codefendant and attended the accused's confidential attorney-client conferences. We held that the right to counsel guaranteed by the Constitution "embodies the right to private consultation with counsel" and "is violated when a state agent is present at confidential attorney-client conferences." (*Id.* at p. 752.) Rejecting an exclusionary remedy, we concluded the appropriate remedy was dismissal of the charges. (*Id.* at pp. 759–760.)

We distinguished *Barber* in *People v. Alexander* (2010) 49 Cal.4th 846 (*Alexander*), where we emphasized that "the officer in *Barber* participated in many meetings during which defense strategy was thoroughly discussed; he conveyed, to some degree, the nature of the anticipated defense with his superiors; and he inserted himself directly into the defense preparations . . . . All of this occurred because the officer, with the knowledge of the prosecution, deceived the defendant and their attorneys concerning his true status. [Citation.] In addition, there was evidence that the defendants '[had] been prejudiced in their ability to prepare their defense' after they learned an undercover officer had been in their midst." (*Id.* at p. 895.) In *Alexander*, "detectives intercepted one telephone call between defendant and a defense investigator that covered only limited topics related to certain witnesses, and the interception occurred pursuant to a judicially approved warrant, not 'trickery' by the authorities. There was no evidence anyone other than the

officers monitoring the call learned of its contents, and much of what was discussed in that call was repeated in subsequent calls that were not privileged." (*Ibid.*) On these facts, we declined to decide whether the defendant's state constitutional right to counsel was violated; we instead concluded that reversal was not warranted even assuming a violation. (*Ibid.*) Finding "[n]o evidence establish[ing] that the prosecution gained anything from intercepting the call or that the defense was affected negatively in a way that could have changed the trial's outcome," we concluded that the defendant had not shown "a reasonable probability" of prejudice. (*Id.* at p. 899.)

Similarly here, even assuming Juarez's state constitutional right to counsel was violated, there is no reasonable probability or possibility that absent the violation, a result more favorable to him would have been reached at either the guilt or the penalty phase of the trial. In this case, unlike in *Barber*, no state agent attended confidential attorney-client conferences, and all attorney-client communications remained confidential. Moreover, as noted, neither the investigator nor the prosecution learned the content of any conversations between Juarez and the experts, and the record does not show that the prosecutor's conduct impaired the preparation of his defense or aided the state's presentation of the evidence against him.

We turn now to Juarez's claim that the prosecutor's conduct violated his right to counsel under the Sixth Amendment. "In *Weatherford v. Bursey* (1977) 429 U.S. 545, 549 [51 L.Ed.2d 30, 97 S.Ct. 837] (*Weatherford*) the Supreme Court rejected a per se rule that ' "whenever the prosecution knowingly arranges and permits intrusion into the attorney-client relationship the right to counsel is sufficiently endangered

to require reversal and a new trial." ' Although the high court did not establish a definitive standard for determining when surreptitious state participation in communications between a defendant and his or her attorney or . . . the attorney's agent, *does* violate the Sixth Amendment, it stated that unless the record supports 'at least a realistic possibility of injury to [the defendant] or benefit to the State, there can be no Sixth Amendment violation.' [Citations.] In other words, a court properly rejects a Sixth Amendment claim based on surreptitious state participation in communications between a defendant and his or her attorney or the attorney's agent when the record demonstrates there was no realistic possibility of injury to the defendant or benefit to the prosecution." (*Alexander*, *supra*, 49 Cal.4th at pp. 888–889.)

Weatherford was an undercover law enforcement agent who, along with Bursey and two others, vandalized an office. Bursey was arrested and charged, and Weatherford, in order to maintain his undercover status, was fictitiously arrested and charged as well. Weatherford was invited to two meetings with Bursey and his attorney Wise to discuss defense tactics. Weatherford did not share any information he obtained from those meetings. But he did testify at Bursey's trial regarding his undercover activities and the vandalism. After Bursey was convicted, Bursey initiated a civil rights action against Weatherford and others, alleging a deprivation of his Sixth Amendment right to the assistance of counsel. (*Weatherford v. Bursey*, *supra*, 429 U.S. at pp. 547–549 (*Weatherford*).)

The high court observed that Weatherford's testimony did not reveal anything about the meetings, that none of the state's evidence was obtained as a result of his participation in the meetings, and that the district court found that Weatherford did

not communicate about the meetings to his superiors or to the prosecution. (*Weatherford*, *supra*, 429 U.S. at pp. 555–556.) "Moreover, this is not a situation where the State's purpose was to learn what it could about the defendant's defense plans and the informant was instructed to intrude on the lawyer-client relationship or where the informant has assumed for himself that task and acted accordingly." (*Id.* at p. 557.) "There being no tainted evidence in this case, no communication of defense strategy to the prosecution, and no purposeful intrusion by Weatherford," the Sixth Amendment was not violated. (*Id.* at p. 558.)

We applied *Weatherford* in *People v. Ervine* (2009) 47 Cal.4th 745 (*Ervine*). There, the trial court found that jail personnel had read defendant's privileged materials during a search of his cell, but no privileged information had been communicated to the prosecution. We found no Sixth Amendment violation in the absence of evidence that confidential information was conveyed to the prosecution. (*Id.* at pp. 763–765, 768.)

We again applied *Weatherford* in *Alexander*, where the defendant challenged the recording of a telephone call involving himself, his mother, and a defense investigator. We said the "critical facts are comparable [to those in *Weatherford*] in all important respects." (*Alexander*, *supra*, 49 Cal.4th at p. 889.) "In both cases a law enforcement officer who was assisting in the investigation of the defendant's offenses, and who testified at the defendant's trial, became privy to trial strategy discussions between the defendant and the defense attorney or the attorney's agents. In both, the record supported the findings that the information the officer learned was not conveyed to the prosecutors and that the officer's investigation or testimony at

trial was not affected by information learned during the discussions." (*Ibid*.) Neither case was " 'a situation where the State's purpose was to learn what it could about the defendant's defense plans.' " (*Id.* at p. 890.) We also noted that the "defendant's mother repeated to others much of what was discussed during the three-way call" and that the prosecutors therefore "would have learned much of its contents," further decreasing "any possibility that interception of the call hindered the defense or benefited the prosecution." (*Id.* at pp. 889–890.) We thus concluded "the record demonstrates no realistic possibility that defendant was injured by, or the prosecution benefited from, the monitoring and recording of the three-way call" and, accordingly, there was no Sixth Amendment violation. (*Id.* at p. 891.)

Here, unlike in *Weatherford*, *Ervine*, and *Alexander*, the prosecutor purposefully instructed the investigator to review the visitation logs in order to learn about possible defense experts. And the investigator did learn confidential information — namely, the identities of two defense experts — and proceeded to research the background and qualifications of those experts, presumably to gain insight into the defense plan. This conduct improperly invaded the confidentiality to which Juarez was entitled in preparing his defense. Nevertheless, the prosecutor did not learn the content of any conversation between Juarez and the experts, and the Attorney General and Juarez do not point to any trial evidence that was derived or developed from the investigator's access to the visitation logs, nor does Juarez identify any evidence he would have developed or presented had the improper access not occurred. For these reasons and others stated above, we conclude that "the record demonstrates no realistic possibility that defendant was injured

by, or the prosecution benefited from," the investigator's access to the visitation logs, and we thus find no Sixth Amendment violation. (*Alexander*, *supra*, 49 Cal.4th at p. 891.)

Juarez additionally asserts a violation of his Fifth Amendment right against self-incrimination. The Fifth Amendment "prohibits the direct or derivative *criminal use* against an individual of 'testimonial' communications of an incriminatory nature, obtained from the person under official compulsion." (*People v. Low* (2010) 49 Cal.4th 372, 390.) Juarez notes that the experts signed into the jail, but he identifies no statement obtained by compulsion and personal to him, much less used against him at trial. (See *Maldonado v. Superior Court* (2012) 53 Cal.4th 1112, 1127 ["this constitutional provision simply bars the direct or derivative *use* of such officially compelled disclosures to convict or criminally punish the person from whom they were obtained"]; cf. *Izazaga v. Superior Court* (1991) 54 Cal.3d 356, 367–369 [statements of witnesses are not personal to the defendant and therefore fall outside this clause].) His claim therefore fails.

Juarez's asserted violation of his due process rights fares no better. He claims that the prosecutor's use of the logs "disrupt[ed] the reciprocity mandated by the due process clause" because the defense did not have access to the logs or comparable access to information about prosecution experts. "However, as we have explained, because the concern of the due process clause is 'the right of the defendant to a fair trial,' the focus of the reciprocity inquiry under the due process clause is whether any lack of reciprocity ' "interferes with the defendant's ability to secure a fair trial." ' " (*People v. Valdez* (2012) 55 Cal.4th 82, 120.) To the extent there was any lack of reciprocity here, it did not compromise his ability to present a

defense or tilt the balance toward the state to any significant degree.

Nor do we find merit in his undeveloped equal protection argument. Juarez contends that the prosecutor could access the identities of possible defense experts only because he was incarcerated and not released on bail. But he offers no reason why the state may not require persons visiting an incarcerated defendant to identify themselves to prison authorities, even though persons visiting a defendant who is not incarcerated need not.

Finally, as to the prosecutor's contact with CMFG, Juarez argues that the prosecutor learned from CMFG "what it needed to know about any evidence of mental conditions that [Juarez] might use during pretrial motions, or at a penalty phase," and he asserts with little analysis that this interfered with the development of a defense and violated his right against self-incrimination, to equal protection, and to a fair trial. The prosecutor's inquiry into the existence of an inmate's psychotherapy records is also troubling. (See Evid. Code, § 1017, subd. (a) [psychotherapist-patient privilege applies "where the psychotherapist is appointed by order of the court upon request of" defense counsel in order to advise a criminal defendant on presenting a defense based on his or her emotional or mental condition].) But the trial court prohibited the prosecutor from introducing Juarez's jail medical records. For this reason, and for the reasons discussed above, the prosecutor's conduct did not violate these constitutional rights or deprive Juarez of a fair trial.

## C. Denial of Motion for a Mistrial Following Y.M.'s Testimony

Juarez contends that the trial court erred in denying his motion for a mistrial after Y.M. testified. Her testimony, he argues, was so inflammatory that it deprived him of the jury's reasoned moral response and violated his rights to due process, a fair trial, and a reliable penalty determination.

Y.M. testified about the victims' personal characteristics and the emotional and financial impact of their deaths on her. During her testimony, two photographs of the victims and a short videotape of the children were displayed. At one point, the prosecutor asked how she felt when she thought about her children these days. She responded, "I feel a lot of pain for not having been able to do anything for them. I wish I could turn time back and give my life for them. I still remember the day when I was being beaten, and the thing that terrifies me the most is having been unable to do anything for them. Their little faces. Their desperation at seeing how their mother was being beaten, and me unable to do a thing for them." Following her response, the court recessed.

Once her testimony concluded, the defense moved for a mistrial. The defense argued that Y.M.'s testimony was so emotionally charged that it was impossible for the jury to make a dispassionate decision about life or death. The defense also argued that when she left the courtroom during the recess, she cried "very loudly" in the hallway. Although the trial judge did not hear her crying, the prosecutor and the courtroom deputy did, but when the deputy went into the hallway, he found her quiet and no jurors present. The court denied the motion, stating that at the end of the morning, "when [Y.M.] was describing the helplessness she felt as she saw her children's

fear for her, she began to cry uncontrollably." Her emotionalism lasted "about half a minute," and the court recessed. She was "remarkably composed throughout most of her testimony." She became "slightly tearful" on one or "[p]erhaps more than one other occasion" but "not to a point where, other than to cause her to pause before answering a question, it disrupted [the] proceedings in any way." The court concluded that what the jury saw and heard was not "particularly emotionally charged" given the facts of the case.

"Victim impact evidence is admissible during the penalty phase of a capital trial. [Citation.] Section 190.3, factor (a) permits the prosecution to establish aggravation by offering evidence of the circumstances of the crime, including the impact of the crime on surviving victims and on a victim's family." (*People v. Peoples, supra,* 62 Cal.4th at pp. 752–753.) " '[T]he trial court is vested with considerable discretion in ruling on mistrial motions.' " (*People v. Hines, supra,* 15 Cal.4th at p. 1038.)

We see no basis to conclude that the trial court abused its discretion. Y.M.'s testimony spanned less than one day, comprising around 15 transcript pages, and it concerned the victims and the impact of their deaths on her. We have routinely permitted the admission of similar evidence. (See, e.g., *People v. Brady* (2010) 50 Cal.4th 547, 574–579 [testimony about victim's character, immediate reaction to victim's death, and impact of victim's death and videotape depicting victim]; *People v. Peoples, supra,* 62 Cal.4th at p. 753 [photographs of victim].) We have also stated that it is "a normal human response to the loss of a child" for a mother to cry on the stand, and that circumstance "does not render that testimony inflammatory." (*People v. Verdugo* (2010) 50 Cal.4th 263, 298.) Even though

Juarez argues that we have unreasonably expanded the holding in *Payne v. Tennessee* (1991) 501 U.S. 808 (*Payne*) to allow such testimony, he presents "no persuasive reason for us to overrule our own decisions regarding victim-impact evidence." (*People v. Weaver* (2012) 53 Cal.4th 1056, 1086.) The trial court gave a reasoned ruling that Y.M.'s testimony did not invite an irrational response from the jury, and we conclude that her testimony did not render the trial fundamentally unfair.

### D. Execution-impact Evidence

The trial court ruled that Juarez could not introduce testimony about the anticipated impact of his execution on his family unless it illuminated some positive quality in his background. Over his objection, the court accordingly instructed the jury: "You may not consider sympathy for the defendant's family respecting the possibility of his execution except as it may illuminate some positive quality of the defendant's background or character." Juarez contends this rendered his trial fundamentally unfair and violated his constitutional rights to present a defense, due process, equal protection, and a reliable penalty determination. He does not argue that the court improperly excluded specific testimony; rather, he argues that the impact of an execution is a circumstance of the crime and asks us to reexamine our contrary position.

We have held that "[t]he impact of a defendant's execution on his or her family may not be considered by the jury in mitigation." (*People v. Bennett* (2009) 45 Cal.4th 577, 601; accord, *People v. Williams* (2013) 56 Cal.4th 165, 197–198.) None of the reasons offered by Juarez persuades us to revisit our precedent. First, he argues that the Eighth Amendment does not permit excluding evidence that might have mitigating value.

"But nothing in that constitutional rule 'limits the traditional authority of a court to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense.'" (*People v. Wall, supra*, 3 Cal.5th at p. 1071; see *People v. Gonzales* (2012) 54 Cal.4th 1234, 1286– 1287.) Second, he argues that our position conflicts with *Payne, supra*, 501 U.S. 808, but it does not. (Cf. *People v. Bennett*, at p. 602 [*Payne* made clear that "a defendant must be allowed to introduce mitigating evidence 'concerning *his own circumstances*,'" but "execution-impact evidence is irrelevant under section 190.3 because it does not concern a defendant's *own circumstances*"].) Finally, he observes that some courts have admitted execution-impact evidence, but none of the cases he cites are binding on this court.

### E. Prosecutorial Misconduct

Juarez contends that the prosecutor engaged in repeated misconduct that impermissibly skewed his case toward death. He refers specifically to the prosecutor's conduct concerning the jail visitation logs, Dr. Dougherty, and Orozco. Even though we have found and assumed misconduct, we conclude that for the reasons discussed, the misconduct, considered singly or cumulatively, "did not cause reversible prejudice" or amount to "a 'pattern' of misconduct so 'egregious' that it infected the trial with fundamental unfairness." (*People v. Shazier* (2014) 60 Cal.4th 109, 150, 151; see also *People v. Mendoza* (2007) 42 Cal.4th 686, 705, 706, 709.)

## VI. OTHER ISSUES

### A. International Law

Juarez contends that he was deprived of a fair trial and a reliable penalty in violation of customary international law as

informed by the Universal Declaration of Human Rights, the International Covenant on Civil and Political Rights, the American Declaration of the Rights and Duties of Man, and the International Convention Against All Forms of Racial Discrimination. But we have held that " '[i]nternational law does not prohibit a sentence of death when, as here, it was rendered in accordance with state and federal constitutional and statutory requirements.' " (*People v. Sattiewhite* (2014) 59 Cal.4th 446, 489; see also *People v. Hillhouse* (2002) 27 Cal.4th 469, 511.)

In addition, he contends that because racial discrimination permeates the death penalty, capital punishment itself violates international law and norms. He relies on statistical studies that purport to show racial disparities in the charging, sentencing, and imposition of the death penalty, particularly with respect to African-American defendants. We have rejected similar arguments and do so again here. (See, e.g., *People v. Hajek and Vo, supra*, 58 Cal.4th at p. 1253; *People v. Martinez* (2003) 31 Cal.4th 673, 703; *People v. Jenkins* (2000) 22 Cal.4th 900, 1055.)

### B. Challenges to the Death Penalty

Juarez raises a number of challenges to the constitutionality of California's death penalty statute that we have repeatedly rejected. Juarez provides no persuasive reason to revisit the following precedent:

The death penalty statute as construed by this court does not fail to perform the narrowing function required by the Eighth Amendment. (*People v. Schmeck* (2005) 37 Cal.4th 240, 304.) Disputing this, Juarez argues in his reply brief that we have misinterpreted *Pully v. Harris* (1984) 465 U.S. 37 and

*Tuilaepa v. California* (1994) 512 U.S. 967 in so holding. His argument does not persuade us to revisit our conclusion.

Juarez claims that the failure to require the jury unanimously find true the aggravating factors relied on violates the federal Constitution. " 'Nothing in the federal Constitution requires the penalty phase jury to make written findings of the factors it finds in aggravation and mitigation[] [or] agree unanimously that a particular aggravating circumstance exists.' " (*People v. Williams* (2013) 58 Cal.4th 197, 295.) Nor is the death penalty statute unconstitutional for not requiring "findings beyond a reasonable doubt that an aggravating circumstance (other than Pen. Code, § 190.3, factor (b) or (c) evidence) has been proved, that the aggravating factors outweighed the mitigating factors, or that death is the appropriate sentence." (*People v. Rangel* (2016) 62 Cal.4th 1192, 1235.) The high court's recent decisions interpreting the Sixth Amendment's jury trial guarantee do not alter our conclusions. (See *Rangel*, at p. 1235; *People v. Lee* (2011) 51 Cal.4th 620, 651–652; see also *McKinney v. Arizona* (2020) __ U.S. __, __ [140 S.Ct. 702, 708] ["*Ring* [*v. Arizona* (2002) 536 U.S. 584] and *Hurst* [*v. Florida* (2016) __ U.S. __ [136 S.Ct. 616]] did not require jury weighing of aggravating and mitigating circumstances"].)

" ' " 'The sentencing factor of "circumstances of the crime" (§ 190.3, factor (a)) is not unconstitutionally vague and does not result in the arbitrary and capricious imposition of the death penalty.' " ' " (*People v. Powell*, *supra*, 6 Cal.5th at p. 193.) " 'The jury may properly consider evidence of unadjudicated criminal activity under section 190.3, factor (b) [citation], [and] jury unanimity regarding such conduct is not required [citation].' " (*Ibid.*) The trial court does not violate a defendant's

constitutional rights by failing to instruct the jury it must unanimously agree the defendant committed a prior crime under section 190.3, factor (c). (*People v. O'Malley, supra*, 62 Cal.4th at p. 1014.)

The trial court's instructions need not "delete inapplicable sentencing factors, delineate between aggravating and mitigating circumstances, or specify a burden of proof either as to aggravation (except for other crimes evidence) or the penalty decision." (*People v. Schmeck*, *supra*, 37 Cal.4th at p. 305.) "Nor are potentially mitigating factors unconstitutionally limited by the adjectives 'extreme' and 'substantial'. . . ." (*Ibid.*) The sentencing factors are not vague and ill-defined. (*Ibid.*)

The absence of written findings, intercase proportionality review, and disparate sentence review does not render the statute unconstitutional. (*People v. Pearson* (2013) 56 Cal.4th 393, 478; *People v. Bryant, Smith and Wheeler, supra*, 60 Cal.4th at p. 469; *Ervine, supra*, 47 Cal.4th at p. 811.) Imposition of the death penalty does not violate the Eighth Amendment's prohibition against cruel and unusual punishment. (*People v. Adams* (2014) 60 Cal.4th 541, 581–582.)

Finally, these asserted flaws, considered together, do not render the statute unconstitutional. (See *People v. Pearson, supra*, 56 Cal.4th at p. 479.)

## C. Cumulative Prejudice

Juarez contends that the combined errors require reversal of his convictions and sentence. He additionally contends that to the extent errors at the guilt phase do not require reversal of his convictions, they nevertheless require reversal of his sentence.

We have assumed error but found no prejudice at the preliminary hearing by the use of the unsworn, uncertified interpreter, the use of Juarez's interpreter to interpret Y.M.'s outburst, and Juarez's absence when his interpreter did so. We have declined to decide whether sufficient evidence supported the theory of felony murder for the murders of J.M. and A.M., and while we have found sufficient evidence supported the theory of felony murder for the murders of José and Juan, we have assumed that even if there was no sufficient evidence, we still would uphold each of the first degree murder verdicts. We have additionally assumed or found error but no prejudice at trial regarding the difficulties that made it hard to hear the court proceedings, the accuracy of interpreters, the failure to timely advise Juarez of his right to have his consulate notified, the trial court's denial of his motions to suppress evidence obtained during Detective Summers's entry into the trailer and Juarez's statements made during the walk-through, Deputy Walker's testimony about Y.M.'s gesture, Orozco's testimony about Juarez's talk of "being with a girl," and the prosecutor's use of the jail visitation logs and contact with CMFG. Considering these actual or assumed errors altogether, we conclude that their cumulative effect does not warrant reversal of his convictions or sentence. (See *People v. Page* (2008) 44 Cal.4th 1, 54; *People v. Panah*, *supra*, 35 Cal.4th at p. 501.)

## VII.  CONCLUSION

We affirm the judgment in its entirety.


**LIU, J.**


**We Concur:**

**CANTIL-SAKAUYE, C.J.**
**CHIN, J.**
**CORRIGAN, J.**
**CUÉLLAR, J.**
**KRUGER, J.**
**GROBAN, J.**

PEOPLE v. SUAREZ

S105876


Concurring Opinion by Justice Liu


Today's opinion recognizes that while " 'the State has a strong interest in having jurors who are able to apply capital punishment within the framework state law prescribes,' " a criminal defendant " 'has the right to an impartial jury drawn from a venire that has not been tilted in favor of capital punishment by selective prosecutorial challenges for cause.' " (*People v. McKinzie* (2012) 54 Cal.4th 1302, 1328.) "A prospective juror is properly excluded if he or she is unable to conscientiously consider all of the sentencing alternatives, including the death penalty where appropriate." (*Ibid.*, internal quotation marks omitted.) Here we decline to reconsider our decisions upholding the death qualification process. (Maj. opn., *ante*, at pp. 16–21.)

It bears mention, however, that although the United States Supreme Court in *Lockhart v. McCree* (1986) 476 U.S. 162, 168–173, rejected arguments that the death qualification process leads to conviction-prone juries, "a range of studies have continued to emerge post-*Lockhart* that build on the research [submitted in *Lockhart*] showing that death-qualified jurors are quite different from non-death-qualified jurors." (Levinson et al., *Devaluing Death: An Empirical Study of Implicit Racial Bias on Jury-Eligible Citizens in Six Death Penalty States* (2014) 89 N.Y.U. L.Rev. 513, 569, fn. 247 (hereafter Levinson); see *id.* at pp. 543, 568–569 [critiquing *Lockhart* and citing studies finding that death-qualified jurors tend to be more conviction-

prone than ordinary jurors]; Rozelle, *The Principled Executioner:  Capital Juries' Bias and the Benefits of True Bifurcation* (2006) 38 Ariz. St. L.J. 769, 784–785 [study of 1,201 capital jurors from over 350 trials found that death-qualified jurors have disproportionately punitive orientations, are more likely to hold racial stereotypes, and are more likely to be pro-prosecution and conviction-prone]; see also Butler, *Death Qualification and Prejudice:  The Effect of Implicit Racism, Sexism, and Homophobia on Capital Defendants' Right to Due Process* (2007) 25 Behav. Sci. & L. 857; Butler & Wasserman, *The Role of Death Qualification in Venirepersons' Attitudes Toward the Insanity Defense* (2006) 36 J. Applied Soc. Psych. 1744.)

In a multifaceted study of 445 jury-eligible citizens in six death penalty states, including California, researchers found that "the process of death qualification results in capital jurors with significantly stronger implicit racial biases . . . and explicit racial biases than jury-eligible citizens generally."  (Levinson, *supra,* 89 N.Y.U. L.Rev. at p. 569; see *id.* at pp. 559–560.)  The study further found that "death-qualified juries possess stronger implicit biases because the process results in the disproportionate elimination of non-White jurors." (*Ibid.*, italics omitted; see *id.* at pp. 559.)

This latter finding coheres with a substantial body of evidence that Black jurors are significantly more likely than Whites to be excused for cause.  (Frampton*, For Cause: Rethinking Racial Exclusion and the American Jury* (2020) 118 Mich. L.Rev. 785, 792–805 (hereafter Frampton); Cover, *The Eighth Amendment's Lost Jurors:  Death Qualification and Evolving Standards of Decency* (2016) 92 Ind. L.J. 113, 136–138 (hereafter Cover) [examining 1,445 venire members in 11

capital trials in Louisiana between 2009 and 2013]; Eisenberg, *Removal of Women and African-Americans in Jury Selection in South Carolina Capital Cases, 1997–2012* (2017) 9 Ne. U. L.Rev. 299, 316, 335–337 (hereafter *Removal*); Eisenberg et al., *If It Walks Like Systematic Exclusion and Quacks Like Systematic Exclusion: Follow-Up on Removal of Women and African-Americans in Jury Selection in South Carolina Capital Cases, 1997–2014* (2017) 68 S.C. L.Rev. 373, 387–388.) In many cases, the magnitude of racial disparities is greater among jurors excused for cause than among jurors excused through peremptory strikes. (See Frampton, at pp. 800–801; *Removal*, at pp. 335–339, 342–344.) And this phenomenon is not limited to capital cases. (See Frampton, at pp. 794–795 [study of 316 Louisiana criminal trials with 14,616 prospective jurors, 62 percent White and 33 percent Black, showed that jurors challenged by prosecutors for cause were 59 percent Black and 34 percent White, while jurors targeted by prosecutors for peremptory strikes were 54 percent Black and 41 percent White]; *id.* at pp. 796–798 [study of 83 Mississippi criminal trials with 4,717 prospective jurors, 60 percent White and 34 percent Black, showed that jurors challenged by prosecutors for cause were 80 percent Black and 21 percent White, while jurors targeted by prosecutors for peremptory strikes were 68 percent Black and 32 percent White].)

Thus, although much attention has appropriately been paid to the inefficacy of *Batson v. Kentucky* (1986) 476 U.S. 79 in combating racial discrimination in peremptory strikes, there is significant evidence that removal of jurors for cause is an equally if not more significant contributor to the exclusion of Black jurors, which may result in juries with higher levels of implicit bias.

Here, defendant raises these concerns but does not tie them to the record in this case. It would be difficult to do so. As one observer explains, "This data is buried in attorneys' notes and in transcripts of the jury voir dire proceedings in individual capital cases. Strike data are enormously labor intensive to obtain and to aggregate in a meaningful way." (Cover, *supra*, 92 Ind. L.J. at p. 130.) Thus, a starting point for addressing this issue may be to require public reporting of the demographic composition of jury venires and of the prospective jurors who are excused for cause. (See, e.g., *id.* at pp. 148–149 [proposing legislation or a rule of court to require reporting of such data].) Transparency is an important first step to understanding the extent to which racial dynamics affect jury selection.

Several efforts are presently underway in California to make juries more inclusive and representative of our communities. These include a bill to reform the legal framework for rooting out discrimination in the exercise of peremptory strikes (Assem. Bill No. 3070 (2019–2020 Reg. Sess.) as amended July 8, 2020) and a bill to expand the jury pool to include all people who have filed a state tax return (Sen. Bill No. 592 (2019–2020 Reg. Sess.)). Other proposals may soon be in the works. (See Cal. Courts Newsroom, California Supreme Court Names Jury Selection Work Group (July 6, 2020).) If the goal of these efforts is to better ensure that juries reflect a cross-section of our communities, then the topics worthy of attention

may include whether current standards and processes for excusal of prospective jurors for cause contribute to racial disparities in jury selection and to implicit biases in the resulting petit juries.

**LIU, J.**


**I Concur:**

**CUÉLLAR, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  People v. Suarez

_____

**Unpublished Opinion**
**Original Appeal**  XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S105876
**Date Filed:**  August 13, 2020

_____

**Court:**  Superior
**County:**  Napa
**Judge:**  Scott Snowden

_____

**Counsel:**

Snedeker, Smith & Short, Michael R. Snedeker and Lisa R. Short for Defendant and Appellant.

Kamala D. Harris and Xavier Becerra, Attorneys General, Gerald A. Engler, Chief Assistant Attorney General, Jeffrey M. Laurence, Assistant Attorney General, Alice B. Lustre and Leif M. Dautch, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Michael R. Snedeker
Lisa R. Short
Snedeker, Smith & Short
PMB 422, 4110 SE Hawthorne Blvd.
Portland, OR 97214-5246
(503) 234-3584

Leif Dautch
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
(415) 703-5089